# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### April 9, 2014 Session

## STATE OF TENNESSEE v. HENRY LEE JONES

**Automatic Appeal from the Court of Criminal Appeals
Criminal Court for Shelby County
No. 0306997     John P. Colton, Jr., Judge**

---

**No. W2009-01655-SC-DDT-DD - Filed September 25, 2014**

---

The defendant was indicted for two first degree murders in Shelby County. During the trial, the court allowed the jury to hear evidence of a third murder allegedly committed by the defendant in a different state, ruling that the out-of-state murder qualified as a "signature crime" and was relevant to the issue of identity. The defendant was convicted as charged and received a sentence of death for each offense. In a divided opinion, the Court of Criminal Appeals affirmed. Because the out-of-state murder did not qualify as a signature crime and, under these circumstances, the danger of unfair prejudice outweighed the probative value of the evidence, the trial court erred by allowing the proof of the third murder. Because the error does not qualify as harmless, the convictions must be reversed and a new trial must be granted. On remand, the State may again seek the death penalty for each offense.

**Tenn. Code Ann. § 39-13-206(a)(1) (2014); Judgment of the Court of Criminal
Appeals Reversed; Case Remanded to the Trial Court**

GARY R. WADE, C.J., delivered the opinion of the Court, in which JANICE M. HOLDER, CORNELIA A. CLARK, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

Robert L. Parris (at trial and on appeal), and Michael E. Scholl and Jake Erwin (at trial), Memphis, Tennessee, for the appellant, Henry Lee Jones.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; Gordon W. Smith, Associate Solicitor General; Leslie E. Price, Senior Counsel; William L. Gibbons, District Attorney General; and Thomas D. Henderson and John Campbell, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
## I. Facts and Procedural History

On the afternoon of August 23, 2003, Margaret Coleman stopped by to check on her sixty-six-year-old mother, Lillian James, and her eighty-two-year-old step-father, Clarence James, at their home in Bartlett. The front door was partially open, and there were linens, papers, and other items strewn about the house, which was ordinarily neatly maintained. When she called out for her mother and received no response, she dialed 911. Officers with the Bartlett Police Department soon arrived and discovered the bodies of the victims inside the house. Both victims had incision wounds on the neck, among other injuries. There were also signs of strangulation. An extensive investigation led the police to develop Henry Lee Jones (the "Defendant") as the primary suspect.

On October 7, 2003, the Shelby County Grand Jury indicted the Defendant for two counts of first degree premeditated murder and two counts of first degree felony murder. Later, the Defendant was arrested in Florida. The State filed a notice of intent to seek the death penalty.

### A. Tennessee Rule of Evidence 404(b) Hearing

On July 19, 2004, the State filed a "Notice of Intention to Use Evidence of Proof of Other Crimes in Order to Establish Identity." In particular, the State sought to introduce evidence that the Defendant killed Carlos Perez in a motel room in Melbourne, Florida, four days after the murders of Mr. and Mrs. James. While acknowledging that Tennessee Rule of Evidence 404(b) prohibits the admission of evidence of other crimes to show action in conformity with a character trait, the State asserted that the modus operandi in the Perez murder and was so distinctive and so strikingly similar to the modus operandi in the James murders that proof of the Perez murder was admissible as evidence on the issue of identity. The State later amended its notice, seeking to also introduce evidence that the Defendant, using a similar modus operandi, had killed another individual, Keith Gross, in Fort Lauderdale, Florida, on September 7, 2002, approximately one year prior to the murders of Mr. and Mrs. James. In order to determine whether the proof surrounding the Perez and Gross murders qualified for admission under Tennessee Rule of Evidence 404(b), the trial court conducted a pre-trial hearing. The terms of Rule 404(b) provide context for the purpose of the hearing:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's

presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

At the Rule 404(b) hearing, a proceeding which involved five days of testimony, Tevarus Young, a witness for the State, testified that in August of 2003 he was homeless and had spent a night at a park in Fort Lauderdale. He recalled that when he awoke he was confronted by the Defendant, who was driving a light-beige, four-door Dodge. According to Young, the Defendant introduced himself as "Bambam" and offered to pay Young for oral sex. Young agreed, got into the car, and was driven to a McDonald's Restaurant. The Defendant then took Young on a series of errands, stopping by a woman's residence to make a phone call, visiting two pawn shops, and driving to a courthouse in Miami to pay some traffic tickets.

According to Young, the Defendant then drove "to some warehouses where [Young] performed oral sex on him." Afterward, the Defendant gave Young twenty dollars and asked him if he would like to meet some women the Defendant knew in Daytona. Young agreed. After stopping to pick up some clothes at the residence of Young's grandmother, the two men traveled approximately 250 miles north to meet two otherwise unidentified women called "Toosie" and "Tawana." The Defendant left with Toosie, and Young spent the night with Tawana. When the Defendant and Toosie returned the next morning, they were arguing. Although Young claimed that he wanted to stay in Daytona and start a new life with Tawana, the Defendant convinced him to leave so they could visit some of his relatives. Although he did not know where they were going, Young recalled that the Defendant drove for "[m]aybe a day, a day and a half." Young fell asleep during the latter part of the trip, and when he awoke he was alone in the car, which was parked in front of a Burger King Restaurant in Bartlett, Tennessee. He remembered that a Burger King employee approached the car, asked for the Defendant, and left. Eventually, Young went inside the Burger King and saw the same employee having a conversation with the Defendant. A different employee brought them some food and, after their meal, the Defendant drove to a nearby apartment complex and parked his vehicle.

Young and the Defendant got out of the car and encountered an elderly African-American man, later identified as Mr. James, who was sitting in his garage. The Defendant said, "Hey, Pops, how are you doing?" Mr. James then informed the Defendant that he had just been released from the hospital and was waiting for a man to come and mow his lawn. Young claimed that he offered to mow the lawn for free, but that Mr. James asked only that he move the lawnmower from the front yard to the back yard.

Young testified that when he returned to the front yard, neither the Defendant nor Mr. James were in sight and the garage door was closed. Young knocked on the front door, but received no answer. When he walked inside, he saw the Defendant with a bloody rope and two bloody towels in his hand. According to Young, the Defendant then entered one of the rooms, threw to the floor an elderly woman, later identified as Mrs. James, and shouted, "[O]ld lady, do you know what time it is, do you know what time it is[?] . . . [W]here's your purse? . . . [W]here's the money?" When, in response, Mrs. James pointed the Defendant to another room, he tied her arms and legs, took off her rings, and directed Young to sit in a chair by the door. As the Defendant left the room to look for the purse, Mrs. James asked Young if they were going to kill her. When Young answered that he thought that the Defendant was related to her, Mrs. James explained that she did not even know the Defendant.

According to Young, the Defendant returned, picked up Mrs. James, and used her body to push Young into the hallway and then into a bedroom. Young testified that the Defendant threw Mrs. James to the floor, placed the rope around her neck, choked her by pressing his foot into the back of her neck, and then cut her neck with a knife, killing her. The Defendant explained to Young that Mrs. James had seen his face.

Young stated that the Defendant then went to another part of the house and returned with a plastic grocery bag. He led Young into a laundry room, where Mr. James was lying, apparently dead. Mr. James' body was surrounded by blood and his hands were tied behind his back. The Defendant removed the ropes used to tie Mr. James' hands and placed them in the bag that Young held. Eventually, the Defendant put the contents of Mrs. James' purse into the bag and the two men left the house. As the Defendant drove away, he threw several items out of the car window. The Defendant later took a billfold from the bag, removed the cash, and threw the billfold out the window. He gave Young approximately $1500 in cash and the rings he had taken from Mrs. James' fingers. Young claimed that the Defendant then displayed his knife and threatened to kill him if he told anyone of the murders. The Defendant drove to a shopping center and bought clothes and shoes for himself and Young. As they drove away, the Defendant instructed Young to change into his new clothes and throw his old clothes out the window.

Young testified that the Defendant next drove to a used car dealership in Mississippi. After talking with a salesman, the Defendant purchased a white Lincoln Town Car. From there, the two drove back to Florida, with the Defendant driving the Lincoln and Young following in the Dodge. Young claimed that along the way he decided to try to escape from the Defendant or, if necessary, "to have a car fight with him." As he was about to pass the Defendant, however, he noticed that a police vehicle had activated its blue lights, so he pulled over to the side of the road. Young initially gave the officer a false name. The Defendant turned around and stopped his Lincoln behind the officer's vehicle during the course of the stop. When the officer learned Young's real name, he discovered an outstanding warrant for Young's arrest. After being taken into custody, Young was questioned about the murders in Bartlett. He first told the officers that he had remained outside while the Defendant entered the residence of an elderly couple and killed them. On the next day, Young "broke down and . . . told them everything that happened," including what he had seen inside the residence.

Margaret Coleman, the daughter of Mrs. James and the step-daughter of Mr. James, also testified at the Rule 404(b) hearing. She stated that Mr. James had recently retired and that Mrs. James worked the night shift in the environmental services department at Methodist Central Hospital in Memphis. Because she did not drive, Mrs. James typically rode a bus to work and had one of her children drive her home at the end of her shift. When Coleman arrived at 1:30 a.m. on Saturday, August 23, 2003, her mother was not at the hospital, and so she assumed that her mother had found another way home. Coleman telephoned Mrs. James at her house at that time and later in the morning, but received no answer. At first, she suspected that Mrs. James may have been without phone service because of a recent storm. Coleman visited Mr. and Mrs. James' residence between 2:30 and 3:00 that afternoon. When she noticed that the garage door was closed, the front door was open, and the inside of the residence was in disarray, she called 911. Coleman testified that her mother owned diamonds, gold jewelry, and several credit cards, and that Mr. James owned a brown wallet.

Phillip Devers, an officer with the Bartlett Police Department, testified that he was dispatched to the James residence. He found the body of Mrs. James lying "face down in a large pool of blood, clothed only in a pair of panties." He described her head as "almost cut completely off." When Officer Devers looked into the laundry room, he discovered the body of Mr. James lying on his side on the floor in a pool of blood. He did not enter the room because he could not open the door any further without disturbing the location of the body. Officer Devers then went outside and waited for backup.

Lieutenant Joseph Massey, also with the Bartlett Police Department, carried out the task of diagraming the rooms of the James residence. He observed a piece of duct tape about the size of a quarter on Mrs. James' right shoulder and a cord under her right foot. In

addition, he found blood in and around the sink in one of the bathrooms, which suggested that the murderer had made some attempt to clean the crime scene.

Michael Smith, the owner of a used car dealership in Batesville, Mississippi, located about seventy miles south of Bartlett, also testified at the Rule 404(b) hearing. He recalled that between 5:20 and 5:25 p.m. on Friday, August 22, 2003 (the day of the James murders), the Defendant, accompanied by another man, arrived in a white Dodge Aries K-car and purchased a white Lincoln Town Car. Smith testified that the Defendant appeared to be in a hurry and paid in cash, which the Defendant claimed to have received through a tax refund.

Carlos Reyes, a homicide detective with the Brevard County Sheriff's Office in Florida, testified that on August 25, 2003 (three days after the James murders), he was driving southbound on Interstate 95 near Melbourne, Florida, in an unmarked police vehicle when he noticed a man, later identified as Young, driving a white Dodge Aries K-car in a reckless fashion—weaving in and out of traffic, cutting off other vehicles, and following too closely. When the Dodge tailgated Detective Reyes, he first flashed his blue lights as a warning, and, a few minutes later, when the Dodge passed him at a speed in excess of the limit, he conducted a traffic stop. When asked for his license, registration, and proof of insurance, Young admitted to Detective Reyes that he did not have his license with him and provided a false name. He claimed that he was following his step-father, but was unable to tell the detective his step-father's name. A few minutes later, a white Lincoln Town Car driven by the Defendant pulled behind the detective's vehicle. At that point, Detective Reyes instructed the Defendant to stay in his car and called for backup. Another officer in a marked police car arrived within two minutes. When Detective Reyes asked the Defendant to identify the driver of the Dodge, the Defendant responded that he was "someone he just met through a friend." The Defendant explained that he had just purchased a second vehicle and had paid Young to follow him to Florida in the Dodge. The Defendant provided his license and the proper documentation for both vehicles.

When further questioned, Young identified himself and provided his correct date of birth. Because Young had an outstanding warrant in Broward County, Florida, for an "occupied burglary and assault," he was placed under arrest. Detective Reyes instructed the Defendant to leave the scene and to "come back in around twenty . . . minutes" to retrieve the Dodge. When the Defendant did not return, Detective Reyes left the Dodge parked on the side of the road.

Ravindra Patel, the manager of a Super 8 Motel in Melbourne, Florida, testified at the Rule 404(b) hearing about the Perez murder. Patel stated that he saw a mid-sized white sedan enter the motel parking lot at 1:00 p.m. on August 26, 2003 (four days after the James murders), and observed the passenger, a white male wearing khaki shorts and a t-shirt, step

out of the car, enter the motel office, and then return to the car. Patel stated that an African-American male exited the car and entered the motel with the other man. Patel described the African-American male as short, skinny, and approximately nineteen or twenty years old, wearing long pants and a button-up shirt worn open over a t-shirt. Later, when Patel was working at the front desk, he noticed that the white male had rented Room 217. According to Patel, on the following day, a housekeeping employee discovered a body on the bed in Room 217. The body was partially covered by a comforter. Patel called 911 and did not allow anyone to enter the room until police arrived.

Johnny Lawson of the Melbourne Police Department investigated the murder at the Super 8 Motel. Although he found no identification on the body in Room 217, a motel clerk provided a registration card with the name Carlos Perez and a Pennsylvania driver's license number. Officers learned that Perez had previously lived in Florida, returned briefly to Pennsylvania, and only a month before had moved back to Florida to live with his father in Wilton Manors—some 150 miles south of Melbourne. According to Detective Lawson, another officer learned that a credit card belonging to a murder victim in Bartlett, Tennessee, had been used at a gas station located approximately five miles from the Super 8 Motel where Perez's body was discovered. The officers also received information that the Bartlett police were on the lookout for a white Lincoln in connection with their murder investigation.

On the morning of September 4, 2003 (two weeks after the James murders), Detective Lawson, accompanied by several other officers, traveled to Perez's workplace—Dependable Temps in Fort Lauderdale—to ask his co-workers if they knew why he had been in Melbourne on the day he died. While there, one of the officers noticed a white 1993 Lincoln Town Car with the personalized license plate "69BAM." Although the officers asked several employees about Perez, none had any new information, and so the officers left. Detective Lawson then ran a check on the "69BAM" tag number and discovered that it was registered to the Defendant. When the officers returned to check the vehicle identification number, the Lincoln was gone. Detective Lawson then learned that the Defendant was also an employee of Dependable Temps.

By searching motor vehicle records, Detective Lawson determined that the Defendant also owned a white 1987 Dodge Aries K-car. Records showed that the same Dodge had been stopped three days after the James murders on Interstate 95 in Brevard County. When Detective Lawson contacted officers with the Brevard County Sheriff's Office, he learned that Tevarus Young had been arrested on an outstanding warrant during the stop. Detective Lawson later spoke with Detective Reyes, who described the actions of the Defendant during the August 25th traffic stop. Detective Lawson then contacted the Bartlett Police Department to relay the information he had collected. When Detective Lawson mentioned the name of the Defendant, the Bartlett police discovered that the Defendant had previously resided

within a mile of the James residence. Lieutenant Massey traveled to Melbourne, where he and Detective Lawson compared the crime scenes and the time lines in their respective investigations.

On September 12, 2003, Detective Lawson and Lieutenant Massey interviewed Young at the Broward County Detention Center. After waiving his Fifth Amendment rights, Young talked to the officers for several hours. Detective Lawson described Young as "congenial" during the first part of the interview, but stated that Young later became upset to the point of physical illness, "throwing up[] in the trash can, rolling on the floor, screaming, hollering, crying, banging his hands, trying to talk but unable to because he was crying so hard." When Detective Lawson and Lieutenant Massey returned the next day to conduct a second interview, Young changed his story, and, when the officers challenged the veracity of his statements, he became upset and changed his story again.

Approximately one month after the interviews with Young, the Defendant was indicted for the murders of Mr. and Mrs. James, a warrant for his arrest was issued, and he was apprehended in Florida. Around the same time, officers in Florida executed warrants to seize and search both the Dodge and the Lincoln owned by the Defendant. After his arrest, the Defendant waived his Fifth Amendment rights and agreed to a recorded interview by Detective Lawson and another detective from his unit. Detective Lawson testified as to the content of the statement. The Defendant acknowledged that he knew Perez through his employment with Dependable Temps and that on a couple of occasions the two had purchased cocaine together. While denying any contact with Perez on the day he died, the Defendant admitted that he owned a white 1987 Dodge Aries K-car and a white 1993 Lincoln Town Car. According to the Defendant, Perez had been in both cars in the past. The Defendant also admitted that he had purchased the Lincoln in Mississippi and that Young had helped him transport the Lincoln to Florida. The Defendant acknowledged his awareness of the stop and arrest of Young in Brevard County. He stated that he took a bus from Fort Lauderdale back to Melbourne to get the Dodge the day after the stop. By the time the Defendant made his statement to the police, Detective Lawson had already verified with Greyhound Bus Lines that the Defendant had purchased a bus ticket two days after the Brevard County traffic stop and one day after Perez had checked into the Super 8 Motel. Detective Lawson testified that a copy of the ticket was found during a search of one of the Defendant's vehicles.

Dr. O'Brian Cleary Smith, the Shelby County Medical Examiner and a witness for the State, provided medical testimony concerning the murders of Mr. and Mrs. James. Dr. Smith, an expert in forensic pathology, examined the crime scene at the James residence and performed the autopsies of Mr. and Mrs. James. His autopsy report, which listed Mr. James' height as five feet, nine inches and his weight as 137 pounds, indicated that Mr. James had

sustained three distinct neck injuries. First, he suffered a fracture of his cervical spine, likely caused by either compressive forces applied to the neck or forcible flexion of the neck. Dr. Smith explained that this type of injury may result from bending the head down in a forceful manner, which can cause the bones of the spine to compress so tightly that they fracture. He stated that the compression results from "pushing the head down," as may occur when something forcefully "cause[s] the chin to drop down on the chest or in some instances a maneuver like a half-nelson where the [attacker's] forearm is across the neck and the other arm is at the back of the head." He described the second neck injury as a fracture of the hyoid bone, which is between the base of the jaw and the top of the Adam's apple. The hyoid fracture was caused by compressive forces applied to the front of the neck in a left-to-right direction. As to both the cervical spine and hyoid fractures, Dr. Smith testified that these injuries, while not fatal on their own, were indicative of the application of "moderate to severe" forces that "can have effects on other structures of the body that can result in strangulation." He stated that the third category of neck wound suffered by Mr. James consisted of "sharp force injuries," including four incisions and a single stab wound.[1] Dr. Smith described the incision wounds as "confluent," meaning that they may have started in multiple distinct areas but they ran together "to create one slightly ragged wound" on the front of the neck. The stab wound occurred on the right front part of the neck and resulted in a punctured windpipe.

Dr. Smith further reported that Mr. James' eyes showed signs of petechial hemorrhaging, the rupture of small blood vessels within the "membrane that lines the inside of the eyelids and also covers the majority of the white of the eye that one sees." He testified that petechial hemorrhaging often occurs in cases of strangulation. The autopsy further indicated that bindings had been used on Mr. James' extremities. In particular, there were pressure marks on each forearm, "indicating that some type of narrow band-like material had been applied" in a forcible manner. The left forearm had incision wounds that demonstrated "an absence of active bleeding," meaning that the wounds had been inflicted at the time of or after death occurred. Fragments of a red metallic material—likely copper—were present in the incision, and the pressure marks were consistent with the use of a metallic wire binding. Dr. Smith found that Mr. James sustained fractures to both the left and right side of the ribs resulting from a compressive force. He described the pattern of bleeding around the rib injuries as indicative that they occurred while Mr. James was still alive. Dr. Smith testified that the injuries were consistent with the attacker standing on Mr. James' back while

---

[1] Dr. Smith defined an incision as "a wound made by an instrument of sharp force, such as a knife or a sharp piece of glass," that is "longer and wider than it is deep." In contrast, he defined a stab wound as a wound that is made by an instrument of sharp force and that is deeper than it is long or wide, which typically occurs "when [a] sharp object is inserted into the body instead of being dragged across the surface of it."

he lay face down on the floor. He further noted, however, that any other method of applying compressive force could also explain the rib fractures, especially given that his bones were more fragile than most due to osteoporosis.

Dr. Smith also discovered a bruise on the right side of Mr. James' tongue, which may have been caused by the tongue "being pinched by a tooth." There was bleeding on the base of the left side of the tongue caused by the stab wound to the neck. The autopsy also revealed "blood in the airway," which typically occurs when a person has blood somewhere in their "upper airway" and struggles to breathe, thereby causing the blood to go "down the[] windpipe and . . . into the air sacs of the lung." Dr. Smith determined the cause of death for Mr. James to be "multiple injuries to different areas of the body by different mechanisms."

Dr. Smith also performed the autopsy of Mrs. James. He found that Mrs. James, who was five feet, six inches tall and weighed 184 pounds, sustained five incisions in the neck—two confluent incisions on the right side, which created a single wound just under an inch in depth, and three confluent incisions on the left side, which created a wound that was three inches deep and reached all the way to the spine. He discovered multiple superficial incisions in the chin area and other injuries indicating that Mrs. James had been strangled. Parallel lines of bruising on the right side of the neck, combined with deeper bruising of the muscles underneath, suggested that her attacker had forcibly applied a hard object to her neck. Dr. Smith found signs of petechial hemorrhaging in the eyes and face, which, as noted, often appear in cases of strangulation. Dr. Smith displayed photographs that showed bleeding into the membranes of Mrs. James' eyes, caused by either the petechial hemorrhaging or blunt trauma to the head. Mrs. James also had bruising on her tongue, the back of her throat, and her windpipe, which indicated that "the compressive force may have driven the tongue and the uppermost portion of the airway back with enough force to cause bleeding of those elements."

Dr. Smith found no conclusive forensic evidence that Mrs. James had been bound, but he did identify signs consistent with bondage. Specifically, Dr. Smith noted bruising on the back of the right wrist that may have been caused by a rope or other ligature, as well as incisions to the forearm area that "may have been the result of the severance of a ligature." The pattern of bleeding around the forearm incisions suggested that they occurred close to the time of death. Mrs. James' ring finger on her left hand had pressure marks indicating that she had worn two rings on that finger. There was a small abrasion just above the pressure marks, which Dr. Smith testified could have been caused by the forceful removal of the rings. Dr. Smith testified that "multiple injuries" caused the death of Mrs. James.

On cross-examination, Dr. Smith testified that he had performed "thousands" of autopsies of homicide victims in Shelby County and the surrounding area during his career

of nearly thirty years in forensic pathology. According to Dr. Smith, a "sizable percentage" of homicides involved either a death attributable to "multiple injuries" or a death "caused by sharp instruments like knives." Dr. Smith stated that "throat cutting" had become increasingly common in recent years and was not an unusual method of homicide in 2003. He further explained that in such cases, multiple incisions are typical because, unlike surgical instruments, ordinary knives provide an inefficient method of cutting through loose skin in order to reach the tissue underneath. He stated that a non-surgical knife must typically "be applied in a serial fashion to increase the depth of the injury with each subsequent cutting action." Dr. Smith described stab wounds to the neck as "not particularly rare" in cases where a victim's throat has been cut. In Dr. Smith's experience, "asphyxiation by possible strangulation" was "probably a little bit more common than throat cutting." Dr. Smith testified that bondage was not unusual and, like throat cutting, had become more prevalent in recent years. When asked whether the combination of bondage, throat cutting, and asphyxiation by possible strangulation was uncommon, Dr. Smith responded, "No."

Although Mrs. James was found dressed in only her panties, Dr. Smith testified that he found no evidence of sexual assault or sexual deviancy. In his opinion, the crime scene was unusual only in that it was a double homicide, the victims were found in separate parts of the residence, and the victims appeared to be "regular folks" who lived in a well-kept home, whereas in most "crime scenes, especially in a home, the home has been used for illicit activities." Dr. Smith distinguished between ligature strangulation, which involves the use of "some sort of flexible object, [such as] a wire, a cord, [or a] rope," and "compressive force strangulation," which involves the use of a rigid object. Dr. Smith clarified that there had been no evidence of ligature strangulation as to either victim, but the autopsy of Mrs. James revealed evidence of compressive force strangulation. Regarding the position of Mrs. James' body, Dr. Smith testified that Mrs. James had been found lying face down with a pool of blood behind her, which suggested that she had been "in a position other than that in which she was found at the time that [her] neck wounds were produced." Dr. Smith confirmed that it was not unusual for a victim whose throat has been cut to be found lying face down.

On redirect examination by the State, Dr. Smith testified that gunshot wounds were likely the most common form of homicide in Shelby County, followed by sharp force injuries, "multiple injuries," and blunt force trauma. Dr. Smith estimated that less than half of Shelby County homicides involve incision wounds. A smaller percentage involve both incisions and strangulation, and an even smaller percentage involve incisions, strangulation, binding, and the removal of the bindings prior to discovery. On re-cross-examination, however, Dr. Smith reiterated that the elements of the homicides of Mr. and Mrs. James—throat cutting, strangulation, binding, and the removal of bindings—are not unusual, and that the combination of these elements is "[n]ot unique."

-11-

Melbourne Police Department Officer Scott Dwyer, who investigated the crime scene at the Super 8 Motel where the body of Carlos Perez was discovered, also testified at the Rule 404(b) hearing. He conducted a vacuum sweep of the carpet to collect hair and fiber evidence. There was blood spatter on the wall by the bed and on a night stand, consistent with the deep laceration in Perez's neck. After photographing the body, Officer Dwyer used an alternative light source to scan the bathroom floor for shoe prints. Officer Dwyer recovered four footwear impressions from the tile floor, which were preserved and later transferred to a crime laboratory for comparison. Officer Dwyer also recovered twenty-seven fingerprints from the room, but none of the prints matched the Defendant, Perez, or anyone else involved in the investigation. Officer Dwyer testified that while searching for prints, he observed "distinctive wipe down marks" on several surfaces in the room, indicating that someone had used a wet cloth in an attempt to clean the area to remove any fingerprints. Officer Dwyer also noted that the pillow cases, towels, and washcloths were missing from the room.

Officer Dwyer acknowledged that hairs collected from the bed and comforter were tested for DNA, and the hairs did not match the DNA of either Perez or the Defendant. Hair and debris collected from Perez's pubic area were also tested and did not match the Defendant's DNA. Officer Dwyer reported that five cigarette butts were recovered from the room and tested. Some of the cigarette butts matched the DNA of Perez, and one of the butts tested positive for female DNA. Officer Dwyer testified that DNA testing was also performed on a sample retrieved from a swab of Perez's penis, and the DNA profile from the swab was that of a female. Officer Dwyer indicated that fluid recovered from Perez's anal cavity did not match the DNA profile of Perez or the Defendant. Because the samples taken from Perez's genitals and anal cavity did not match Perez's DNA, it appeared to Officer Dwyer that "some kind of sexual activity [had taken] place." Officer Dwyer reiterated his conclusion that the room had been wiped down, but he admitted that it was impossible to ascertain when the wiping down occurred and that it could have resulted from motel employees cleaning the room before Perez checked in.

Special Agent Thomas Davis with the Florida Department of Law Enforcement ("FDLE")[2] testified that on September 16, 2003, he and other agents executed a search warrant on the Defendant's Lincoln Town Car. He supervised the search of the vehicle, during which officers found a pair of Nike tennis shoes in the trunk. The shoes were transferred to the custody of Emily Strickland, an FDLE crime analyst, for shoe-print comparison.

_____

[2] The record reflects that the FDLE is the investigative state police agency for Florida, comparable to the Tennessee Bureau of Investigation.

Strickland, an expert in footwear impression comparisons, testified that in 2003, she was assigned the task of comparing the pair of Nike tennis shoes seized from the Defendant's Lincoln to a latent shoe print recovered from the bathroom in the Super 8 Motel. Using standard techniques, Strickland determined that the prints from the crime scene were made by Nikes of the same size, shape, and "tread design" as those recovered from the Lincoln. In addition, Strickland explained that footwear impression analysts look for "individual characteristics," which a shoe may acquire after the manufacturing process when something happens that gives the shoe a unique print, such as a person damaging the sole by walking over a sharp rock or a piece of glass. Strickland found on the Nikes two individual characteristics that matched the latent prints from the Perez crime scene: first, both the Nikes and the latent prints had a "cut" in the shape of a finger that matched in terms of size and position, and, second, Strickland identified a "wear pattern" on the edge of the left Nike, near the arch, that showed up in the print. Based on these findings, Strickland initially concluded in her report that the prints at the Perez crime scene "could have been made" by the Nikes recovered from the Defendant's Lincoln. Upon further consideration, however, she believed that the prints were "most likely" made by the Nikes.

Dr. Sajid Qaiser, the Brevard County Medical Examiner and an expert in forensic pathology, performed the autopsy of Perez. Dr. Qaiser observed evidence of ligature strangulation, including a ligature mark almost completely encircling the neck, and petechial hemorrhaging in the eyes, eye lids, and the area of the face surrounding the eyes. Dr. Qaiser also observed seven to eight incisions on the neck, which created a wound that was seven to twelve inches long and one to two inches deep. The neck incisions resulted in the severance of the internal jugular vein and were consistent with the application of a knife or a similar sharp object. Dr. Qaiser found blood in the lungs and throughout the tracheal bronchial tree, indicating that Perez had both aspirated and ingested blood as a result of the incisions to his neck. Dr. Qaiser further testified that there were abrasions on one of Perez's wrists, as well as tape residue on both wrists. The nature of the abrasions indicated that they occurred after Perez's death, likely as a result of the removal of the tape. Dr. Qaiser concluded that the cause of death was ligature strangulation and incision wounds to the neck.

On cross-examination, Dr. Qaiser testified that he observed "marks" or "furrows" on the neck, wrists, and ankles, all indicating that the victim had been bound. The size and pattern of the marks suggested that the attacker had used a "band-like" ligature approximately one quarter inch in width. Dr. Qaiser testified that there was a small injury on Perez's back that may have been a bite mark. Dr. Qaiser further testified that although the anal opening was dilated and two fresh abrasions were present on the walls of the anal opening, this was not necessarily indicative of non-consensual sexual activity. In addition, Dr. Qaiser noted that the toxicology report for Perez revealed the presence of marijuana. Dr. Qaiser further observed that although the hyoid bone and larynx were intact, that is not

unusual in cases of ligature strangulation.[3]

At the conclusion of the hearing, the trial court issued a written order addressing the admissibility of the proposed evidence of the Perez murder under Tennessee Rule of Evidence 404(b). The trial court first determined that "the method of commission of the [Perez murder] establishes such a unique modus operandi that it fairly leads to the inference that the perpetrator of the Perez murder was the perpetrator of the James murders." The trial court found that the murders of Perez and Mr. and Mrs. James shared the following characteristics: (1) multiple incision wounds to the neck; (2) strangulation; (3) the use of bindings; (4) the body being found face down; and (5) an attempt by the perpetrator to "wipe down" or "clean" the scene after the murder. The trial court further observed that both Mrs. James and Perez were found nude or partially unclothed, and that "it appear[ed] that each of the victim[s] may have known [the] attacker." The trial court acknowledged the existence of "some differences" between the Perez murder and the James murders, especially the fact that Perez was a "young, male victim[] who showed signs of recent sexual activity," whereas the Jameses were "elderly victims" who were not sexually assaulted. Nevertheless, the trial court found that the similarities between the crimes outweighed "any differences in the victimology of the offenses."

Second, the trial court concluded that the proof "of the other crime, wrong, or act" presented by the State at the hearing qualified as "clear and convincing." See Tenn. R. Evid. 404(b)(3). The trial court emphasized the likely shoe print match, the fact that the Defendant and Perez had worked together, and "additional evidence plac[ing] the [D]efendant in the area at the time of the murder."

Third, the trial court deferred ruling as to whether "a material issue exists other than conduct conforming with a character trait," such as the identity of the perpetrator, indicating that the proof at trial would dictate the result. See Tenn. R. Evid. 404(b)(2). Nevertheless, the trial court provided guidance by informing the parties that if the proof were to place at issue the Defendant's identity as the perpetrator of the murders of Mr. and Mrs. James, then the evidence that the Defendant killed Perez in a similar fashion would be material to the issue.

_____

[3] During the Rule 404(b) hearing, the State also offered testimony from numerous witnesses regarding the murder of Keith Gross in Fort Lauderdale, Florida, on September 7, 2002, approximately one year prior to the murders of Mr. and Mrs. James. The State sought permission from the trial court to allow evidence of the Gross murder in the prosecution of the Defendant for the murders of Mr. and Mrs. James. The trial court held that the evidence pertaining to the Gross murder was inadmissible because it was "simply too remote in time to have sufficient relevance to the issue of the [D]efendant's identity as the perpetrator of the instant crimes." Because the trial court excluded all evidence of the Gross murder and the State has not appealed that ruling, we have omitted that evidence from our summary of the facts.

Fourth, the trial court also deferred ruling as to whether the probative value of the evidence of the Perez murder was "outweighed by the danger of unfair prejudice." See Tenn. R. Evid. 404(b)(4). The trial court again indicated that resolution of this issue would depend upon the proof at trial.

Finally, the trial court observed that because of the "nearly inextricable investigative connection" between the Perez murder and the James murders, "it may be necessary to admit at least portions of proof, relating to the Perez murder, in order to create a complete picture for the jury of the investigation conducted by the Bartlett authorities."

### B. Guilt Phase

During the guilt phase of the trial, the State offered testimony from many of the same witnesses who had testified at the Rule 404(b) hearing prior to trial. Detective Carlos Reyes (the detective who pulled over and arrested Young), Margaret Coleman (the daughter of Mrs. James), and Michael Smith (the car dealer who sold the Lincoln to the Defendant) all provided testimony as to the investigation of the James murders that was in all material respects consistent with their prior testimony.

During the testimony of Officer Phillip Devers (the Bartlett police officer who first responded to the scene of the James murders and discovered the victims), the State sought to admit photographs of the bodies of Mr. and Mrs. James. The defense objected to both photographs on the basis that they were overly inflammatory and prejudicial. The trial court admitted the photographs, holding that the pictures were not inflammatory because they depicted the bodies as they were "found immediately upon going into the area where they were deceased." The remainder of Officer Devers' testimony was consistent with his testimony during the Rule 404(b) hearing.

Lieutenant Joseph Massey's testimony about his first two interviews with Tevarus Young was essentially the same as Detective Johnny Lawson's account of the interviews. Lieutenant Massey testified that Young was "very emotional" during the first interview, crying uncontrollably and vomiting. While confirming that Young calmed down somewhat for the second interview, Lieutenant Massey stated that Young continued to "cry uncontrollably at times." Lieutenant Massey also confirmed that Young changed his story numerous times. Lieutenant Massey acknowledged that Young repeatedly lied to the officers during the interviews. He also conceded that James White, an individual who lived near the James residence, had initially been another viable person of interest in the course of the investigation.

Detective David Neyman of the Bartlett Police Department, who went to three different gas stations in Mississippi where Mrs. James' stolen credit card was used, was able

to view surveillance video at two of the gas stations. Detective Neyman observed a Dodge Aries K-car in the video from a gas station where the stolen card was used in Batesville, Mississippi, and observed the same Dodge following a white Lincoln Town Car when leaving a gas station where the same card was used in Madison, Mississippi. The second video included footage of an African-American male wearing a yellow shirt exiting and reentering the Lincoln Town Car. Detective Neyman acknowledged, however, that the surveillance video did not include an image of the person using the stolen card. The State introduced into evidence records showing that Mrs. James' credit card was used to purchase gas at a Citgo station in Memphis at 3:18 p.m. on the date of the James murders and at several gas stations in Mississippi and Florida on the night of the murders and over the following two days.

Diane Armstrong, the Defendant's niece, testified that she and her husband had previously helped get the Defendant a job at the Burger King in Bartlett, where they both worked. She recalled that in August of 2003, the Defendant showed up unexpectedly at her house, and that a "young man" whom she could not identify was asleep in the Defendant's car. She stated that she informed the Defendant that her husband was at Burger King and that he could go get breakfast there.

Wesley Armstrong, Diane's husband, testified that on the same morning, he was returning from making a deposit when he saw the Defendant's car parked in the lot at the Burger King where he worked. Armstrong learned from the man inside the vehicle that the Defendant was inside the restaurant. Armstrong described the man in the car as a "skinny," young African-American man with "braids in his hair." Armstrong spoke briefly to the Defendant and gave food to the Defendant and the other man, after which they left.

Christopher Stallion, an employee of the City of Bartlett, testified that he frequently drove past the James residence and would often see Mr. James sitting in his garage. Stallion recalled that on the date of the murders, at approximately 1:00 p.m., he drove by and saw Mr. James talking with two African-American men in front of his garage. Stallion could not provide any further description of the men, although during the investigation he told officers that one of the men was approximately six feet, one inch in height and the other was slim and had a "low hair cut."

James White, a resident of Bartlett who mowed lawns for supplemental income, testified that he often mowed the lawns for the neighbors of Mr. and Mrs. James but had never worked for the Jameses. White, who was initially a person of interest in the investigation of the murders, maintained his innocence at all times. The police interviewed him and searched his residence. When asked about his drug use, White admitted to previously using crack cocaine but denied using it at the time of the murders.

-16-

Tevarus Young's testimony at trial was consistent with his testimony from the Rule 404(b) hearing, although he testified to certain additional facts. For example, when asked to recount what happened at the James residence, Young testified that after the Defendant tied Mrs. James and rummaged through her purse, she informed the Defendant that her son was supposed to be coming to the house. According to Young, the Defendant responded, "[I]f he come[s] he['s] going to get the same thing you're going to get." The Defendant then pushed her into another room and strangled her with a rope before cutting her throat. Young further testified that the Defendant removed the rings from Mrs. James' fingers, put them in the plastic bag along with the contents of her purse, and later put on the bracelet he had stolen and gave Young the rings.

As at the Rule 404(b) hearing, Young testified that following the James murders, the Defendant purchased the Lincoln Town Car. He added that some time after the purchase, the Defendant raped Young at a rest area "somewhere on the interstate." According to Young, they again stopped to see Toosie and Tawana, the Defendant left for a while with Toosie, and Young did "a lot of drugs." When the Defendant came back, they continued on their trip until Young was stopped and arrested in Brevard County.

On cross-examination, Young admitted that after being pulled over by Detective Reyes, he wanted to get rid of Mrs. James' rings because they tied him to the murder. Young denied that he kept Mrs. James' rings as "trophies," lied to the police as part of his "game," or falsely portrayed himself as the victim in order to avoid prosecution. He admitted, however, that he had initially lied to the police by stating that he, the Defendant, and Wesley Armstrong had gone to the James residence, where he waited in the car while the Defendant and Armstrong went inside. Young ultimately admitted that Armstrong had nothing to do with the murders. Young acknowledged that he had been charged with facilitation of first degree murder, and that he did not have a plea deal but hoped to receive leniency in exchange for testifying against the Defendant.

Dr. O'Brian Cleary Smith's trial testimony was consistent with his testimony at the Rule 404(b) hearing concerning the injuries to Mr. and Mrs. James. On direct examination, the State sought to admit four photographs of the autopsy of Mr. James and three photographs of the autopsy of Mrs. James. The trial court admitted the photographs over the Defendant's objection. When asked on cross-examination about the marks on Mrs. James' right wrist, Dr. Smith acknowledged that he classified the marks as ligature marks based "mainly on the other circumstances surrounding the scene and Mr. James's [ligature marks]," rather than making the determination solely on the marks themselves. Moreover, Dr. Smith testified that the only unusual aspect of the case was the identity of the victims, not how the murders were committed. Dr. Smith explained that murders involving a combination of techniques are something "that you see." He further testified that the cutting of the throat

took place "relatively frequently" and was not a unique homicide method.

Following the introduction of this evidence, the trial court addressed the Rule 404(b) issues left unresolved at the pre-trial hearing—whether identity was at issue and whether the probative value of the proposed evidence was outweighed by the risk of prejudice to the Defendant. The trial court ruled that identity was a material issue at trial and that the risk of prejudice did not outweigh the probative value of the proof in light of the Defendant "vigorously challeng[ing]" Young's testimony and raising the issue of other "possible suspects." Upon ruling that the evidence of the Perez murder was admissible, the trial court instructed the jury as follows:

> Jurors, the State at this time intends to present proof regarding another crime or crimes allegedly committed by the [D]efendant other than that which he's on trial for, and you may not consider such evidence to prove his disposition to commit such a crime on this case here.

> This evidence may only be considered by you for the limited purpose of determining whether it provides proof of [the D]efendant's identity, that is, such evidence may be considered by you if it tends to establish the [D]efendant's identity in the case on trial.

A number of witnesses then testified as to the circumstances of the Perez murder. Ravindra Patel, Special Agent Thomas Davis of the FDLE, and FDLE crime analyst Emily Strickland all provided testimony at trial that was consistent with their prior testimony at the Rule 404(b) hearing.

The State sought to admit five photographs of the Perez crime scene during the testimony of Officer Scott Dwyer (one of the Melbourne police officers who investigated the Perez murder). The Defendant objected to three of the photographs on the grounds that they were cumulative and prejudicial due to their graphic nature. Although the trial court excluded one of the three photographs, the other two were admitted. Officer Dwyer acknowledged that the Super 8 Motel at which the murder was committed is in an area of high crime and prostitution, and that he believed the Perez murder to be sexual in nature. The remainder of his testimony was substantially the same as his testimony at the Rule 404(b) hearing.

Detective Johnny Lawson (another Melbourne police officer who investigated the Perez murder) testified that he believed the crime scene at the Super 8 Motel had features which initially suggested that the crime was "probably" sexual in nature. He also characterized the area where the Super 8 Motel is located as being a "high crime rate area."

-18-

Detective Lawson did not address his interviews with Young as extensively as he did during the Rule 404(b) hearing, but his trial testimony was otherwise consistent with his earlier testimony.

Dr. Sajid Qaiser's trial testimony was essentially identical to his testimony at the Rule 404(b) hearing. Four photographs of the Perez autopsy were admitted as evidence, all over the Defendant's objection.

Patti Orta, a crime lab analyst for the FDLE, identified a pair of Nike shoes, a woman's ring, a J.C. Penney bag, clothing, and multiple cleaning products found in the searches of the Defendant's automobiles.

Catherine Theisen, a forensic mitochondrial DNA examiner for the FBI, compared pubic hair found at the Perez crime scene with the Defendant's mitochondrial DNA, concluding that the Defendant could not be excluded as the source of the hair found at the scene of Perez's murder. She stated that mitochondrial DNA is not unique to a particular individual, but that the FBI has a database to determine if a particular sample is common or rare. Theisen determined that "[she] would not expect to see that type" in more than .26% of the African-American population, .17% of the Caucasian population, or .39% of the Hispanic population.

The Defendant chose not to testify. After receiving instructions from the trial court, the jury returned verdicts of guilt for the felony murder and the premeditated murder of both Mr. and Mrs. James.

## C. Penalty Phase

During the penalty phase, the State offered victim impact evidence from Turkessa Kenetta Helton, the granddaughter of Mrs. James and a middle school Language Arts teacher. She testified that her family was particularly close. She explained that all of Mrs. James' children would drive her to and from work and often took her shopping. She further testified that she had named her daughter after Mrs. James and that she wished Mrs. James could see her son and daughter grow up. Helton described Mr. James as nice, generous, and family-oriented.

As mitigating evidence, the defense called Eddie Jones, the Defendant's brother, to testify about their childhood. Jones explained that they grew up in a very poor family in Cleveland, Mississippi, with ten brothers and four sisters. Jones remembered that their older brothers were "very abusive" to both him and the Defendant, hitting them with water hoses, coat hangers, belts, and extension cords. He also recalled that when the Defendant was approximately five years old, one of their older brothers gave a gun to the Defendant and

directed the Defendant to shoot him. The Defendant pulled the trigger, but the gun was unloaded. Jones stated that the Defendant had been imprisoned for fifteen to sixteen years, but, upon release, became actively involved with their family, especially with his nieces and nephews. Jones asked the jury for mercy.

Against the advice of his counsel, the Defendant chose to testify. He recalled that he had a difficult childhood and described being beaten with water hoses and belts. The Defendant stated that he never developed a relationship with his father, but that his mother "did the best she could." He admitted that at age eighteen he had been convicted of robbery and served sixteen years of a thirty-year sentence. He testified that while serving this sentence, he apologized to the victim and sought forgiveness. The Defendant maintained his innocence of the murders of Mr. and Mrs. James. He also denied ever sexually assaulting another person or paying Young for oral sex. The Defendant contended that Young had fabricated his account of the murders while he was incarcerated at the Broward County Detention Center. The Defendant acknowledged that he and Young traveled from Florida to Tennessee and back, but denied that they committed any crimes together. The Defendant further stated that he previously resided within one mile of Mr. and Mrs. James' residence and had seen them before but had never spoken with them. Although the Defendant admitted to smoking marijuana on occasion, he testified that he was not on drugs at the time of the murders.

The parties stipulated that the Defendant had previously been convicted of five violent felony offenses arising out of three incidents in Florida. On March 29, 1982, the Defendant was convicted of two counts of battery of a law enforcement officer; on April 23, 1982, he was convicted of aggravated battery; and on July 21, 1982, he was convicted of robbery and kidnapping.

The trial court instructed the jury to consider the following aggravating circumstances: (1) that the Defendant had previously been convicted of one or more violent felonies; (2) that the murders were especially heinous, atrocious, or cruel; (3) that the murders were committed for the purpose of avoiding or interfering with a lawful arrest or prosecution; (4) that the murders were knowingly committed while the Defendant had a substantial role in committing or attempting to commit a robbery; and (5) as to Mr. James only, that the victim of the murder was seventy years of age or older. See Tenn. Code Ann. § 39-13-204(i)(2), (5)–(7), (14) (2014). In addition, the trial court instructed the jury to consider the following as possible mitigating circumstances: (1) whether the Defendant was an accomplice to the murder committed by another and the Defendant's participation was relatively minor; (2) any lingering doubt as to the Defendant's guilt; (3) the fact that the accomplice would not be charged with capital murder and would not face a possible death sentence; (4) the fact that

-20-

the Defendant may face a capital murder charge;[4] (5) the Defendant's background and childhood; and (6) any other mitigating circumstance raised by the evidence.

The jury imposed a death sentence as to each count, having unanimously found that the State proved all of the aggravating circumstances beyond a reasonable doubt and that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt.

### D. Appellate Proceedings

On direct appeal, the Defendant challenged the admission of the evidence of the Perez murder, the sufficiency of the evidence to support his convictions, the admission of certain victim photographs, and the constitutionality of Tennessee's sentencing statute for first degree murder. State v. Jones, No. W2009-01655-CCA-R3-DD, 2013 WL 1697611, at *22 (Tenn. Crim. App. Apr. 18, 2013). A majority of the panel of the Court of Criminal Appeals rejected each of these claims. The panel majority also addressed the issues of mandatory review set out in Tennessee Code Annotated section 39-13-206(c)(1)(A)–(D) (2014) and concluded that the death sentences were not imposed in any arbitrary fashion; that the evidence supported the aggravating circumstances found by the jury; that the evidence supported the jury's finding that the aggravating circumstances outweighed any mitigating circumstances; and that the death sentences were not excessive or disproportionate to the penalty imposed in similar cases. Id. at *50-54. The majority opinion affirmed the convictions and the sentences of death, but, as required by law, remanded with instructions for the trial court to merge each conviction for felony murder into the corresponding premeditated murder conviction. Id. at *55 (citing State v. Kiser, 284 S.W.3d 227, 234 (Tenn. 2009)).

Judge Camille R. McMullen dissented, finding that the State had "failed to show that the method used in these murders was so unique as to constitute a signature that would give rise to the inference of identity." Id. (McMullen, J., dissenting). Moreover, because Judge McMullen was "unable to conclude that the erroneous admission of the [Perez] murder did not [a]ffect the outcome of the verdict," she concluded that a new trial should be granted as to the murders of Mr. and Mrs. James. Id. at *59.

---

[4] As to the fourth mitigating circumstance, the trial court instructed the jury that "the [D]efendant may face a capital murder charge." The written instructions, however, read as follows: "The Defendant may face a capital murder charge in Florida." (Emphasis added.) After a bench conference, the trial court decided not to re-instruct the jury as to that mitigating factor but left the reference to Florida in the written charge.

## II. Analysis

The Defendant challenges the sufficiency of the evidence and asserts that the trial court erred by allowing evidence of the Perez murder.

## A. Sufficiency of the Evidence

The first issue is whether the evidence adequately supports the jury's finding of guilt as to each count of first degree murder. Our standard for reviewing the sufficiency of the evidence, both direct and circumstantial, is limited. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). We must afford the State "the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007) (citing State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978)). The determinative question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). Although we review de novo the application of the law to the facts, Jordan v. Knox Cnty., 213 S.W.3d 751, 763 (Tenn. 2007) (citing State v. Thacker, 164 S.W.3d 208, 247-48 (Tenn. 2005)), we cannot substitute our own inferences for those drawn by the factfinders at trial, State v. Lewter, 313 S.W.3d 745, 747-48 (Tenn. 2010).

When the only proof of a crime is the uncorroborated testimony of one or more accomplices, the evidence is insufficient to sustain a conviction as a matter of law. State v. Collier, 411 S.W.3d 886, 894 (Tenn. 2013) (citing State v. Little, 402 S.W.3d 202, 211-12 (Tenn. 2013)). This Court has defined the term "accomplice" to mean "one who knowingly, voluntarily, and with common intent with the principal unites in the commission of a crime." Id. (citing State v. Bough, 152 S.W.3d 453, 464 (Tenn. 2004); Clapp v. State, 30 S.W. 214, 216 (Tenn. 1895)). The test for whether a witness qualifies as an accomplice is "'whether the alleged accomplice could be indicted for the same offense charged against the defendant.'" Id. (quoting Monts v. State, 379 S.W.2d 34, 43 (Tenn. 1964)). Although a defendant cannot be convicted solely upon the uncorroborated testimony of an accomplice, "corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged." State v. Bane, 57 S.W.3d 411, 419 (Tenn. 2001) (quoting State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994)). Corroborative evidence must lead to the inferences that a crime has been committed and that the defendant is implicated in the crime. Id.

The Defendant asserts that "[t]here is a complete lack of evidence to corroborate the testimony of indicted co-conspirator, Tevarus Young, and no rational jury could find beyond a reasonable doubt that the [Defendant] was guilty of any of the crimes upon which he was convicted." The State contends that Young's testimony was adequately corroborated and established the elements of each offense. The State has not challenged the determination by the Court of Criminal Appeals that "Young's admitted participation in the offenses was sufficient to render him an accomplice in the murders of Mr. and Mrs. James." Jones, 2013 WL 1697611, at *44. We agree that Young's involvement qualifies him as an accomplice. The question before us, therefore, is whether Young's testimony was adequately corroborated by other evidence.

Wesley and Diane Armstrong of Bartlett, Tennessee, confirmed that the Defendant visited both their residence and their place of employment, a Burger King Restaurant, in August of 2003. The Armstrongs testified that the Defendant was accompanied by an unknown person whom they described as a skinny African-American male with braided hair—a description that would closely resemble Young. The Armstrongs' testimony is consistent with Young's testimony as to the events leading up to the James murders.

Christopher Stallion testified that at approximately 1:00 p.m. on the date of the murders, he saw two African-American men standing with Mr. James near his garage. This is consistent with Young's testimony that he and the Defendant had talked with Mr. James in front of the Jameses' garage prior to the murders.

Young testified that just after the murder and several times during their drive back to Florida, the Defendant used a credit card stolen from the victims to purchase gas. The State introduced records confirming the use of Mrs. James' card at a gas station in Memphis at 3:18 p.m. on the date of the James murders. The State also produced documentation of purchases made with the same credit card on the night of the murders and over the following two days at several gas stations in Mississippi and Florida. Surveillance video from a gas station in Batesville, Mississippi, at approximately 8:00 p.m. on the day of the James murders, depicted a Dodge Aries K-car matching that owned by the Defendant. Video from a gas station in Madison, Mississippi, taken on the same date at approximately 11:00 p.m., showed an African-American male with a yellow shirt, which is consistent with Young's testimony that the Defendant purchased such a shirt at J.C. Penney. The Madison video showed that the man in the yellow shirt exited and then reentered a Lincoln Town Car, and also showed that the Lincoln, upon leaving the station, was followed by a Dodge Aries K-car.

Michael Smith, the owner of a used car dealership in Mississippi, confirmed Young's testimony that the Defendant paid cash for the Lincoln Town Car shortly after the murders. Detective Carlos Reyes verified Young's testimony that he was stopped and arrested in

Brevard County, Florida, and that the Defendant returned to the place of the stop to acknowledge his ownership of the car driven by Young. Further, during a search of the Defendant's Lincoln, Florida officers discovered a J.C. Penney bag and a ring, the latter of which was later identified by Margaret Coleman as belonging to Mrs. James.

Of further significance, the testimony of Dr. Smith, the Shelby County Medical Examiner, corroborated Young's testimony as to both the nature of the injuries sustained by Mr. and Mrs. James and the manner in which they were murdered. Dr. Smith testified that both Mr. and Mrs. James sustained incision wounds to the neck and displayed signs of strangulation and bondage, all of which was consistent with Young's testimony. Dr. Smith also found abrasions that were compatible with the forcible removal of rings from Mrs. James' fingers, as Young testified the Defendant had done. Moreover, Dr. Smith's description of the crime scene verified Young's testimony that he and the Defendant left Mrs. James' body in one of the bedrooms and left Mr. James' body in the laundry room.

This corroborative evidence, which confirmed Young's testimony as to the events before, during, and after the murders of Mr. and Mrs. James, fairly and legitimately tends to connect the Defendant with these crimes. See Bane, 57 S.W.3d at 419. In consequence, Young's testimony was adequately corroborated.

Furthermore, Young's testimony, combined with the other evidence at trial, was sufficient for a rational trier of fact to find the essential elements of each offense beyond a reasonable doubt. In this instance, the offenses at issue are first degree premeditated murder and first degree felony murder. Premeditated murder, defined as the "premeditated and intentional killing of another," Tenn. Code Ann. § 39-13-202(a)(1) (2014), "may be established by any evidence from which a rational trier of fact may infer that the killing was done 'after the exercise of reflection and judgment,'" State v. Leach, 148 S.W.3d 42, 53 (Tenn. 2004) (quoting State v. Davidson, 121 S.W.3d 600, 615 (Tenn. 2003)). Felony murder is defined, in relevant part, as "[a] killing of another committed in the perpetration of or attempt to perpetrate . . . [a] robbery." Tenn. Code Ann. § 39-13-202(a)(2). For a felony murder conviction, "[n]o culpable mental state is required . . . except the intent to commit" the underlying offense, id. § 39-13-202(b), which in this instance is robbery. "Robbery is the intentional or knowing theft of property from the person of another by violence or by putting the person in fear." Id. § 39-13-401(a) (2014).

Young testified that he witnessed the Defendant murder Mrs. James and observed the body of Mr. James after the Defendant had been alone with him just moments before. The evidence established that the Defendant used weapons, including a knife and rope, upon unarmed victims who were particularly vulnerable because of their ages. The Defendant's method of killing Mr. and Mrs. James—which involved binding, strangulation, and throat

cutting—was especially cruel. The Defendant explained to Young that he had killed Mrs. James because she had seen his face. The Defendant's robbery of the Jameses' money, credit cards, and jewelry indicates another motive for the murders. The Defendant proceeded methodically and calmly after the murders, and attempted to clean the crime scene before making his escape. Each of these facts is indicative of premeditation and, taken together, they provide a basis for a rational trier of fact to infer that the murders were committed "after the exercise of reflection and judgment," as required by Tennessee Code Annotated section 39-13-202(d). See Leach, 148 S.W.3d at 53-54 (noting that circumstances which may support a finding of premeditation include the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, the destruction or secretion of evidence of the killing, a defendant's calmness after the killing, and the motive for the killing). As a result, the evidence adequately supports the Defendant's convictions for the first degree premeditated murders of Mr. and Mrs. James.

As to the felony murder convictions, the evidence demonstrated that the Defendant used threats and violence to accomplish the theft of a billfold from Mr. James and the theft of money, credit cards, and jewelry from Mrs. James. The proof further established that Mr. and Mrs. James died as a result of injuries sustained from the use of violence by the Defendant. Accordingly, the evidence supports the Defendant's convictions for the first degree felony murders of Mr. and Mrs. James during the perpetration of a robbery.[5]

### B. Admissibility of the Evidence of the Perez Murder

The second question is whether the trial court properly admitted evidence relating to the Perez murder. As noted, this issue is governed by Tennessee Rule of Evidence 404(b), which generally prohibits "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity with the character trait." The Rule, however, allows such evidence "for other purposes" upon the following conditions:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

---

[5] As noted by the Court of Criminal Appeals, our law requires "the merger of multiple convictions of first degree murder involving a single victim." Kiser, 284 S.W.3d at 234 n.2 (citing State v. Cribbs, 967 S.W.2d 773, 788 (Tenn. 1998)). Thus, while the evidence is sufficient to support each of the convictions in this case, the convictions for premeditated murder and felony murder should have been merged, resulting in a single judgment of conviction as to each victim.

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

The comments to the Rule provide that the evidence of other crimes, wrongs, or acts should be excluded unless relevant to an issue other than the character of a defendant, such as identity, motive, intent, or absence of mistake. See Tenn. R. Evid. 404, Advisory Commission cmt.; see also Bunch v. State, 605 S.W.2d 227, 229 (Tenn. 1980). In State v. Parton, 694 S.W.2d 299, 303 (Tenn. 1985), the decision upon which the Rule is based, this Court specifically held that before the proposed evidence can be admitted, the trial court must first find that the Defendant's connection to the other crime, wrong, or act has been clearly and convincingly established. In 2003, Rule 404(b) was amended to confirm the "clear and convincing" requirement explicated in Parton. See Tenn. R. Evid. 404(b)(3) & 2003 Advisory Commission cmt.

Trial courts have been encouraged to take a "restrictive approach of [Rule] 404(b) . . . because 'other act' evidence carries a significant potential for unfairly influencing a jury." State v. Dotson, 254 S.W.3d 378, 387 (Tenn. 2008) (second alteration in original) (quoting State v. Bordis, 905 S.W.2d 214, 227 (Tenn. Crim. App. 1995)) (internal quotation marks omitted). In Old Chief v. United States, the United States Supreme Court pointed out that "'the risk that a jury will convict for crimes other than those charged—or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment—creates a prejudicial effect that outweighs ordinary relevance.'" 519 U.S. 172, 181 (1997) (quoting United States v. Moccia, 681 F.2d 61, 63 (1st Cir. 1982)); see also Michelson v. United States, 335 U.S. 469, 475-76 (1948). In Dotson, this Court reaffirmed the policy of exclusion:

The rationale behind the general rule is that admission of other wrongs carries with it the inherent risk of the jury convicting a defendant of a crime based upon his or her bad character or propensity to commit a crime, rather than the strength of the proof of guilt on the specific charge. . . . As this Court has consistently cautioned, the jury should not "be tempted to convict based upon a defendant's propensity to commit crimes rather than . . . evidence relating to the charged offense."

254 S.W.3d at 387 (second alteration in original) (quoting Spicer v. State, 12 S.W.3d 438, 448 (Tenn. 2000)).

Although appellate courts have repeatedly emphasized a restrictive approach to Rule

404(b), the decision of a trial court to admit or exclude evidence will not be overturned on appeal absent an abuse of discretion, provided that the court adhered to the Rule's procedure. Kiser, 284 S.W.3d at 288 (citing State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997)). The terms of Rule 404(b) direct the trial court to first hold a hearing outside the presence of the jury to assess the criteria set forth in the Rule. Tenn. R. Evid. 404(b)(1). This Court has previously observed that a trial court may, as in this instance, conduct the required hearing prior to trial. State v. Gilley, 173 S.W.3d 1, 6 (Tenn. 2005). Nevertheless, because "the Rule 404(b) criteria . . . require consideration of the evidence at trial," we have cautioned that "if pretrial evidentiary rulings are made, they may need to be reconsidered or revised based on the evidence presented at trial." Id.

Here, as our Court of Criminal Appeals acknowledged, see Jones, 2013 WL 1697611, at *40, and as the Defendant concedes, the trial court complied with the Rule 404(b) procedure by hearing the proposed evidence prior to trial, considering each of the criteria in light of the evidence presented at trial, and making the required findings prior to admitting the evidence. Abuse of discretion is, therefore, our standard of review. "'A court abuses its discretion when it applies an incorrect legal standard or its decision is illogical or unreasonable, is based on a clearly erroneous assessment of the evidence, or utilizes reasoning that results in an injustice to the complaining party.'" State v. Adams, 405 S.W.3d 641, 660 (Tenn. 2013) (quoting Wilson v. State, 367 S.W.3d 229, 235 (Tenn. 2012)).

### 1. Existence of a Material Issue

The first criterion under Rule 404(b) is whether "a material issue exists other than conduct conforming with a character trait." Tenn. R. Evid. 404(b)(2). "[E]vidence that the defendant committed another crime is admissible only if the ground for relevance"—in this instance, the identity of the perpetrator—"is actually being contested in the case on trial." Bunch, 605 S.W.2d at 230. If a defendant's identity is conclusively established by other proof at trial, then identity is no longer at issue and the evidence of the other crime should not be admitted. White v. State, 533 S.W.2d 735, 739 (Tenn. Crim. App. 1975) (quoting Warren v. State, 156 S.W.2d 416, 418 (Tenn. 1941)).

Here, the trial court waited until it had heard the majority of the evidence pertaining to the investigation of the James murders before ruling that identity was a material issue because the Defendant had "vigorously challenged" Young's testimony that the Defendant committed the murders and had raised the issue of other "possible suspects." The Court of Criminal Appeals affirmed this determination. Jones, 2013 WL 1697611, at *41. The Defendant concedes that identity was a material issue at trial. We agree. By challenging the proof that he murdered Mr. and Mrs. James and by attempting to shift the blame to others, most notably Young, the Defendant placed identity at issue. Moreover, the evidence did not establish the Defendant's identity so conclusively as to eliminate the issue as a jury question.

-27-

See White, 533 S.W.2d at 739.

### 2. Clear and Convincing Proof of the Other Crime

The second criterion under Rule 404(b) is whether the Defendant's commission of the other crime was established by clear and convincing evidence. See Tenn. R. Evid. 404(b)(3). The Defendant contends that the evidence established only that: (1) the Defendant knew Perez; (2) the Defendant was in the vicinity of Perez at the time of his death; and (3) Perez checked into the Super 8 Motel accompanied by a skinny, African-American male. Thus, he claims that the State failed to present clear and convincing evidence that he committed the Perez murder. We disagree.

To meet the clear and convincing standard, the trial court must determine that the evidence offered to show the defendant's involvement in the other crime is not "'vague and uncertain.'" State v. Fisher, 670 S.W.2d 232, 236 (Tenn. Crim. App. 1983) (quoting Wrather v. State, 169 S.W.2d 854, 858 (Tenn. 1943)). The clear and convincing evidence standard is more exacting than preponderance of the evidence but less exacting than beyond a reasonable doubt, and it requires that "'there [be] no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Kennedy, 152 S.W.3d 16, 18 (Tenn. Crim. App. 2004) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)); see also Little, 402 S.W.3d at 214 n.7 (observing that "Tennessee is different from most state and federal jurisdictions that evaluate the admissibility of prior crime evidence by a preponderance of the evidence standard"). The burden is on the State to establish by clear and convincing evidence that: (1) another crime was committed; and (2) the crime was committed by the defendant. White, 533 S.W.2d at 743 (quoting Wrather, 169 S.W.2d at 858). "Only thus can identification, or other proof of guilt, of the accused in the pending case be aided by evidence of the [other] crime." Id. (quoting Wrather, 169 S.W.2d at 858).

As indicated, a criminal offense may be established exclusively by circumstantial evidence. Dorantes, 331 S.W.3d at 379. This principle also applies in the context of determining whether another crime has been established by clear and convincing evidence. Accordingly, we may not substitute our own inferences for those drawn by the trial court, which acted as the finder of fact in determining whether the proof of the Perez murder was clear and convincing. See id. ("On appeal, the court may not substitute its inferences for those drawn by the trier of fact in circumstantial evidence cases."); see also State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (noting that "the weight to be given to circumstantial evidence, . . . '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the [finder of fact]'" (second alteration in original) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958))).

At the Rule 404(b) hearing, the State presented significant evidence placing the Defendant in both temporal and physical proximity of the Perez murder. Detective Reyes testified that on August 25, 2003, he initiated a traffic stop near Melbourne, Florida, of a Dodge Aries K-car driven by Young. During the stop, the Defendant pulled behind the detective's vehicle in his Lincoln and acknowledged that he owned the Dodge. Because Young was subsequently arrested, the Dodge was left parked on the side of the interstate, approximately five miles from the Super 8 Motel, and the Defendant was instructed to later retrieve the vehicle. Perez was last seen alive the following day at approximately 1:00 p.m. when Patel, the manager of the Super 8 Motel, observed Perez exit a white, mid-sized sedan—a description matching both of the Defendant's vehicles—and enter the motel office. Thereafter, Perez returned to the vehicle and an African-American male accompanied him into the motel. Perez's body was discovered the next day.

Notably, the Defendant admitted that he had worked with Perez, that they had associated with each other outside of work, and that Perez had been in both the Defendant's Dodge and his recently purchased Lincoln. Most importantly, a Nike shoe print matching the size, shape, and tread design of a shoe recovered from the Defendant's Lincoln was lifted from the motel room's bathroom. FDLE crime analyst Emily Strickland, a footprint impression expert, testified that two unique individual characteristics on the shoe matched the latent prints from the Perez crime scene, indicating a high probability that the footprint impression from the motel room was made by the Defendant's shoe.

Based on this proof, we conclude that the trial court did not abuse its discretion by determining that the evidence of the Perez murder was clear and convincing. The evidence, while circumstantial, was neither vague nor uncertain, see Fisher, 670 S.W.2d at 236, and it provided a sufficient basis for the trial court to conclude, free from serious or substantial doubt, see Kennedy, 152 S.W.3d at 18, that the Defendant murdered Perez.[6]

---

[6] The State urges this Court to consider the testimony of Catherine Theisen, the mitochondrial DNA specialist who determined that the DNA from pubic hairs found in the motel room was consistent with the Defendant's DNA and is of a type found in only a small percentage of the population. As noted by the Court of Criminal Appeals, this evidence was presented for the first time at trial after the trial court's Rule 404(b) ruling and was not available to the trial court in assessing the sufficiency of the evidence of the Perez murder. Jones, 2013 WL 1697611, at *43. We agree with the Court of Criminal Appeals that because the trial court must base its Rule 404(b) findings upon other crime evidence heard outside of the presence of the jury, we must refrain from considering additional evidence presented to the jury after the trial court's Rule 404(b) ruling. See State v. Roshell, No. M2007-02358-CCA-R3-CD, 2009 WL 890875, at *8 (Tenn. Crim. App. Apr. 2, 2009) (limiting review of the evidence to "'the evidence presented at the jury[-]out hearing'" (alteration in original) (quoting Dubose, 953 S.W.2d at 653)), perm. app. denied (Tenn. Aug. 17, 2009).

### 3. Probative Value Versus Danger of Unfair Prejudice

The third and final criterion for the trial court to consider during a Rule 404(b) hearing is the probative value of the other crime evidence versus the danger of unfair prejudice that accompanies the admission of such evidence. State v. Sexton, 368 S.W.3d 371, 405 (Tenn. 2012). This balancing test, under the plain language of the Rule, requires that evidence of another crime be excluded if the danger of unfair prejudice "outweigh[s]" the probative value. Tenn. R. Evid. 404(b)(4); cf. Tenn. R. Evid. 403 (allowing the admission of relevant evidence so long as the danger of unfair prejudice does not "substantially outweigh[]" the probative value of the evidence). "Th[is] restrictive approach of Rule 404(b) recognizes that evidence of other crimes, wrongs[,] or acts carries a significant danger of unfair prejudice." DuBose, 953 S.W.2d at 654. The term "unfair prejudice" has been defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" Id. (alteration in original) (quoting State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978)). When the other crime is similar to the charged offense in the pending case, the danger of unfair prejudice is especially prevalent, increasing the likelihood that "'[the] jury would convict on the perception of a past pattern of conduct, instead of on the facts of the charged offense.'" State v. Mallard, 40 S.W.3d 473, 488 (Tenn. 2001) (quoting Theus v. State, 845 S.W.2d 874, 881 (Tex. Crim. App. 1992)).

The trial court must weigh these concerns of unfair prejudice against any probative value of the proffered evidence, which will depend upon the actual need for the evidence in light of the issues at trial and the other evidence available to the State. State v. Burchfield, 664 S.W.2d 284, 287 (Tenn. 1984) (quoting Shockley v. State, 585 S.W.2d 645, 653 (Tenn. Crim. App. 1978)). Where, as here, the material issue at trial is the identity of the defendant,

> [t]he probative value of evidence of other crimes . . . depends upon the extent to which it raises an inference that the perpetrator of the prior offenses was the perpetrator of the offense in issue. Both the existence and the strength of an inference proceeds through an evaluation of the similarities between the prior offense and the charged crime. Thus, if the characteristics of both the prior offense and the charged offense are not in any way distinctive, but are similar to numerous other crimes committed by persons other than the defendant, no inference of identity can arise. An inference of identity from prior crimes can only arise when the elements of the prior offense and the charged offense, singly or together, are sufficiently distinctive to warrant an inference that the person who committed the prior offense[] also committed the offense on trial. . . . The probative value of evidence of other crimes on the issue of identity always depends upon the strength of the inference; when the inference of identity is weak, evidence of prior crimes should be excluded because under such circumstances the prejudicial effect of the evidence inevitably outweighs

the probative value of that evidence.

Bunch, 605 S.W.2d at 230 (fourth alteration in original) (emphasis added) (quoting United States v. Powell, 587 F.2d 443, 448 (9th Cir. 1978)).

Although the evidence of the other crime need not be identical to the evidence of the charged offense, for other crime evidence to have probative value it must bear a sufficient connection to the issue of identity so as to establish the defendant's commission of "signature crimes." To meet this threshold, the similarities of the crimes must do more than simply outweigh their differences—there must be a "'highly distinctive common mark'" between the crimes. Id. at 231 (quoting People v. Cavanaugh, 444 P.2d 110, 117 (Cal. 1968)); see also State v. Moore, 6 S.W.3d 235, 240 (Tenn. 1999) ("Before multiple offenses may be said to reveal a distinctive design, and therefore give rise to an inference of identity, the 'modus operandi employed must be so unique and distinctive as to be like a signature.'" (quoting State v. Carter, 714 S.W.2d 241, 245 (Tenn. 1986))). The test, therefore, is not whether the evidence demonstrates that the defendant committed both crimes, but whether the defendant used a peculiar and distinctive method in committing the crimes. See Young v. State, 566 S.W.2d 895, 897 (Tenn. Crim. App. 1978). For example, in Harris v. State, this Court recognized that

> a particular strat[a]gem or method [may have] such unusual particularities that reasonable men can consider that it would not likely be employed by different persons. Many men commit murder, but Jack the Ripper used his knife in a manner so peculiar that when his crimes were viewed together there could be little doubt that they were committed by the same man. Merely the fact, however, that a series of such crimes may be committed with a knife will not render them unusual enough to identify the perpetrator of one as the perpetrator of the others.

227 S.W.2d 8, 11 (Tenn. 1950) (citation omitted).

Thus, the focus of our inquiry is whether the trial court erred when it determined that the probative value of the evidence of the Perez murder outweighed the danger of unfair prejudice because the details of the crime were sufficiently distinctive to raise an inference that the Defendant committed the James murders. The State contends, and the trial court found, that strangulation, binding of the victims, removal of the bindings, multiple incisions to the throat, removal of clothes from some of the victims, placement of the bodies face down, and cleaning of the scene after the crime, in combination, constitute a signature crime. Because this finding would require us to ignore numerous differences between the murders as well as the expert forensic testimony offered by the State, it is our assessment based upon

our extensive review of prior decisions of this Court over a number of years, that the trial court's ruling was "based on a clearly erroneous assessment of the evidence." See Adams, 405 S.W.3d at 660. We hold, therefore, that the trial court abused its discretion by admitting the evidence of the Perez murder.

Although the trial court acknowledged that there were some differences between the Perez and James murders, it found that the similarities were distinct enough to establish that the same person committed both crimes. The trial court pointed to the testimony of Dr. O'Brian Cleary Smith as compelling such a conclusion:

> Dr. Smith, the former [M]edical [E]xaminer for Shelby County, testified that death as a result of knife wounds comprise[s] a minority of homicides and even fewer cases have both incised wounds to the neck and strangulation. Dr. Smith further stated that fewer still have incised wounds to the neck; strangulation; binding; and removal of binding prior to discovery of the body. He stated that taking these circumstances in connection with the fact that the victims were found lying face down; the crime scene appear[ed] to be "cleaned up"[;] and the victims were robbed by someone known to them, made the number of similar cases shrink even further.

Unfortunately, however, the record demonstrates that the trial court misconstrued portions of the evidence and neglected to accord appropriate weight to the significant differences between the Perez murder and the James murders. As Judge McMullen observed in her dissenting opinion:

> The charged offense, the [James] murders, occurred in a suburban home and involved two elderly victims. It was perpetrated by two individuals[—]an accomplice, Young, and the Defendant. The uncharged offense, the [Perez] murder, occurred at a motel located in a high crime area and involved a young male victim and an[] unidentified female. The [Perez] murder also involved evidence of a sexual assault, while the [James] murders did not.

> Specifically, the [Shelby County] [M]edical [E]xaminer testified that both of the victims in the instant case died as a result of multiple injuries. Mr. James suffered incised wounds to the neck, a stab wound to his neck, a broken hyoid bone, blunt force injuries to his chest, fractured parts of the front neck bone, and rib fractures. There was also evidence suggesting that (1) his wounds were inflicted after he was killed, (2) possible strangulation, and (3) ligatures or bindings on his extremities. Mr. James's body was found "in repose on his right side." In regard to Ms. James, the medical examiner

testified that she suffered multiple incised wounds to the neck, incised wounds to forearms, and possible strangulation. Asked whether the linear marks on her neck were caused by manual or ligature strangulation, the medical examiner said, "it may [have been] some hard object that was used around the neck, an object could be held against the neck with enough force to compress the neck and leave the marks on the neck." However, other than a "cut," he found no evidence of bondage, and her hyoid bone was intact. Although Ms. James's body was found face down, the medical examiner opined that her body had been moved "in a position other than that in which she was found at the time that the neck wounds were produced."

Jones, 2013 WL 1697611, at *57 (McMullen, J., dissenting).

Moreover, the applicable standard focuses on the distinctiveness of the crimes, not a mere assessment of similarities or an existence of rarity. State v. Roberson, 846 S.W.2d 278, 280 (Tenn. Crim. App. 1992) ("[M]ere similarity in the manner in which two crimes are committed does not produce the relevance necessary for admission—uniqueness does." (emphasis added)). During the Rule 404(b) hearing, Dr. Smith unequivocally rejected all indications that the methodology of the murders was unique or distinctive. Specifically, on cross-examination, he testified as follows:

Q: So, death by slashing the throat has become not unusual. Correct?

A: That's correct.

Q: What about asphyxiation by possible strangulation. Is that unusual?

A: No, sir. That's probably a little bit more common than throat cutting.

Q: What about the two of those combined. Is that unusual?

A: No.

Q: Bondage. . . . Is bondage unusual?

A: No.

. . . .

Q: What about the three of those combined. Is that unusual?

-33-

A: No.

. . . .

Q: So [the bindings on Mr. James] had been removed?

A: Yes, sir.

Q: Is that unusual?

A: No.

Defense counsel then questioned Dr. Smith about the multiple lacerations to the neck:

Q: . . . Is there anything unusual at first glance to these—in the autopsy as far as the incised wounds, anything out of the ordinary that you would see in this sort of homicide?

A: No.

Q: Was there an efficiency to the incised wounds in any way that would indicate any sort of training or technique?

A: No.

. . . .

Q: So four strokes across the same part of [Mr. James'] neck in layman's terms?

A: Yes, sir.

Q: But that's not unusual?

A: No.

Q: Okay. Can you explain?

A: Well, in the absence of a surgical instrument, cutting or incising the skin with a knife is very inefficient. . . . And when the cutting edge is applied to the

skin surface and then dragged across, the skin is going to move and you lose
the power of the knife so that it's more common than not to see a—an incised
wound may first open up the skin and then as the knife is reapplied in a slightly
different area, it goes into the—cuts its way into the already open area from the
first or prior incision, and then once it gains access to the deeper tissues, it cuts
with more efficiency. . . .  To find a single application of a knife in a throat
cutting incident would be unusual.

Although Dr. Smith conceded that the number of murders involving incisions, bondage,
strangulation, bindings removed, and cleaning of the crime scene constituted a minority of
all of the murders in Shelby County, he explained that there was nothing unusual about the
methods employed—even in combination.  Moreover, as Judge McMullen pointed out in her
dissent, not all of the victims were found lying face down, as the trial court mistakenly
observed.

    Our prior case law includes numerous decisions which, as in this instance, involved
offenses with similarities that did not rise to the level of a signature crime.  For example, in
Harris, 227 S.W.2d at 9, the defendant was charged with rape, and the trial court admitted
evidence that he had committed another rape one week earlier.  This Court noted multiple
similarities in the two offenses, including their temporal proximity, the fact that both crimes
were rapes committed by forcible coercion, and the use of a knife in both instances.  Id. at
11.  Nevertheless, because there were also significant differences—including the nature of
the sexual acts committed and the location of the crimes—the Court held that the "methods
pursued were not so peculiar as to" justify admission of the other crime evidence on the issue
of identity.  Id.  Similarly, in State v. Toliver, 117 S.W.3d 216, 227 (Tenn. 2003), the Court
analyzed whether separate incidents of aggravated child abuse shared a similar modus
operandi such that they qualified as signature crimes.[7]  Again, the Court observed numerous
similarities between the two crimes: both involved the same victim (the defendant's step-
son), both involved the defendant striking the victim on the buttocks with a braided extension
cord, and both arose from the victim receiving poor grades.  Id. at 229.  Despite these
similarities, the Court highlighted the differences in the methods employed to commit the
crimes, which included the fact that in one instance the extension cord had been braided with
wire and wrapped with duct tape, whereas in the other instance the victim had been required
to lean over a barrel and the defendant had wrapped the extension cord around the victim's
neck, jerking him around the room.  Id. at 229-30.  Because the method employed did not
"have 'such unusual particularities that reasonable men can conclude that it would not likely

---

[7] Although Toliver involved the question of whether the two cases should have been severed rather
than jointly tried, it employed the same standard in its signature crime analysis.  Id. at 230 (citing Tenn. R.
Evid. 404(b)).

be employed by different persons,'" the Court concluded that "the method employed in committing the offenses [did] not constitute a modus operandi so unique and distinctive as to be comparable to a signature." Id. at 229 (quoting State v. Shirley, 6 S.W.3d 243, 248 (Tenn. 1999)); see also State v. Bobo, 724 S.W.2d 760, 764 (Tenn. Crim. App. 1981) (excluding evidence of a prior armed robbery because, although sharing many characteristics with the armed robbery charged, there was "nothing unique about any of" the similarities, which included the robber using a pistol, being unmasked, wearing a coat and a hat, and targeting a Winn-Dixie grocery store); Young v. State, 566 S.W.2d 895, 899 (Tenn. Crim. App. 1978) ("The test is not whether there was evidence that a defendant committed both crimes, but whether there was a unique method used in committing the crimes. It is not enough that the appellant was wearing the same clothing during the commission of the two crimes, unless in some way, his clothing was a part of the modus operandi.").

In contrast, our cases allowing other crime evidence under a signature crime theory demonstrate the type of unique modus operandi that is lacking in this instance. In Warren, 156 S.W.2d at 419, a robbery case, this Court affirmed the trial court's admission of evidence of another robbery with several striking similarities. In particular, the two robberies occurred within a few nights of one another at the same place and time of night, and in each instance the victims "were robbed by a man dressed in a black cap and overalls, with his face smeared with dark grease or paint, carrying a pistol in one hand and a flash light in the other, who had an impediment in his speech." Id. at 417. In State v. Wooden, 658 S.W.2d 553, 557-58 (Tenn. Crim. App. 1983), abrogated on other grounds by State v. Dyle, 899 S.W.2d 607, 612 (Tenn. 1995), our Court of Criminal Appeals found the signature crime standard satisfied as to two sex offenses with the following similarities: each victim was a young, white female living alone in an apartment; the attacker covered the head of each victim or forced her to turn around so that she could not see him; the attacker forced each victim to submit to cunnilingus and then vaginal intercourse; and the attacker demanded that each victim rub his nipples as he performed vaginal intercourse.[8]

_____

[8] Like Tennessee, other jurisdictions set a high bar for the admission of other crime evidence on a signature crime theory. Compare, e.g., Knox v. State, 621 So. 2d 403, 405 (Ala. Crim. App. 1993) (finding no signature modus operandi in two robberies despite the fact that the victims of both robberies were cab drivers, both crimes occurred after the cab driver picked up the robber, and the robber in both instances brandished a gun), and Diffee v. State, 894 S.W.2d 564, 568 (Ark. 1995) (finding no signature modus operandi in a first degree murder and a prior uncharged incident despite the fact that both incidents involved the use of an ice pick, both occurred in or near the defendant's residence, and both victims were members of the defendant's family), with State v. Porambo, 544 A.2d 870, 874 (N.J. Super. Ct. App. Div. 1988) (finding a signature modus operandi in two armed robberies because in both instances the robber gained entry into a private residence by posing as public safety official and disguised himself using false facial hair, including a "fake mustache[]" that "was distinctive in appearance").

As these authorities demonstrate, while there are similarities between the Perez murder and the James murders, those similarities fail to establish a modus operandi that is comparable to a signature. The trial court erred, therefore, by determining that the evidence of the Perez murder was so distinctive that it raised an inference that the Defendant committed the James murders.

In light of our conclusion that the State failed to establish the Perez murder as a signature crime that could be used to prove the Defendant's identity in the James murders, the admission of the evidence regarding the Perez murder was profoundly prejudicial. By allowing the evidence of the Perez murder, a crime for which the Defendant had not been charged, the trial court created an opportunity for the jury to infer that the Defendant committed the uncharged murder and, therefore, must have committed the murders for which he was on trial. See Dotson, 254 S.W.3d at 387 ("When the defendant's prior bad acts are similar to the crime for which the defendant is on trial, the risk of unfair prejudice is even higher. As this Court has consistently cautioned, the jury should not 'be tempted to convict based upon a defendant's propensity to commit crimes rather than . . . evidence relating to the charged offense.'" (alteration in original) (quoting Spicer, 12 S.W.3d at 448)). Although the trial court gave a limiting instruction to the jury, a substantial amount of evidence was presented regarding the Perez murder. The presentation of the evidence lasted two days and included inherently prejudicial testimony about a sexual encounter at the Perez crime scene, which was absent from the James murders. In the absence of sufficiently distinctive characteristics amounting to a signature crime, the danger of unfair prejudice created by the detailed evidence of the Perez murder clearly outweighed any probative value.

### C. Harmless Error

Because the evidentiary error here is neither structural nor constitutional, our harmless error analysis is governed by Tennessee Rule of Appellate Procedure 36(b), which provides that "[a] final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." This standard "'recognizes that . . . a person convicted of a crime as a result of an essentially fair trial is not entitled to have his or her conviction reversed based on errors that, more probably than not, did not affect the verdict or judgment.'" Sexton, 368 S.W.3d at 429 (quoting State v. Ferrell, 277 S.W.3d 372, 380 (Tenn. 2009)). Our harmless error analysis "does not turn upon the existence of sufficient evidence to affirm a conviction or even a belief that the jury's verdict is correct. To the contrary, the crucial consideration is what impact the error may reasonably be taken to have had on the jury's decision-making." State v. Rodriguez, 254 S.W.3d 361, 372 (Tenn. 2008) (citations omitted).

The evidence connecting the Defendant to the James murders consisted primarily of

the testimony of Young, an accomplice to the murders. No other witness testified as to the Defendant's presence at the crime scene. No forensic evidence tied him to the James murders. Therefore, the evidence of the James murders, although sufficient to support the convictions, is not so overwhelming as to preclude the grant of a new trial. Moreover, as stated previously, the improperly admitted evidence of the Perez murder was extensive. Hardly any evidence in a murder trial could be more prejudicial than evidence that the Defendant committed another murder. In consequence, we are constrained to hold that the erroneous admission of the evidence surrounding the Perez murder more probably than not affected the outcome of the trial. We must, therefore, reverse the convictions and remand for a new trial.

### D. Evidence of Perez Murder as Contextual Background

In addition to allowing the evidence of the Perez murder as proof of the Defendant's identity, the trial court observed the "nearly inextricable investigative connection" between the Perez murder and the James murders, indicating that "it may be necessary to admit at least portions of proof, relating to the Perez murder, in order to create a complete picture for the jury of the investigation conducted by the Bartlett authorities." Because this issue is likely to recur on remand, we will briefly address the use of contextual background evidence that involves other crimes, wrongs, or acts.

As discussed, Tennessee Rule of Evidence 404(b) prohibits the use of other crime evidence "to prove the character of a person in order to show action in conformity with the character trait," although such evidence "may . . . be admissible for other purposes." This Court has held that one of the "other purposes" for which evidence of another crime may be admitted is to provide "contextual background." State v. Gilliland, 22 S.W.3d 266, 272 (Tenn. 2000). Not all background evidence, however, will be admissible, and trial courts must strike a careful balance between evidence that will provide context for the jury and evidence that will only tend to show a defendant's propensity to commit crimes. Id. Thus, within the framework of Rule 404(b), the proper analysis is as follows:

> [W]hen the [S]tate seeks to offer evidence of other crimes, wrongs, or acts that is relevant only to provide a contextual background for the case, the [S]tate must establish, and the trial court must find, that (1) the absence of the evidence would create a chronological or conceptual void in the [S]tate's presentation of its case; (2) the void created by the absence of the evidence would likely result in significant jury confusion as to the material issues or evidence in the case; and (3) the probative value of the evidence is not outweighed by the danger of unfair prejudice.

Id.

We acknowledge that there exists significant overlap between the investigations into the Perez and James murders, including crucial breakthroughs in the James murders during the investigation into the Perez murder. The various law enforcement agencies in Florida and Tennessee worked closely to establish the time lines and certain details of both cases. For that reason, as the trial court observed, it may become necessary to admit at least some portions of the evidence relating to the investigation of the Perez murder in order to alleviate potential confusion caused by a chronological or conceptual void in the explanation of the James murders. We caution the trial court, however, that if such evidence is offered by the State to provide contextual background, the evidence must be carefully scrutinized to ensure that the admissibility requirements of Rule 404(b) and Gilliland are met. The use of limiting instructions to the jury would also be appropriate in this situation. See id. at 273 ("[M]ultiple limiting instructions to the jury from the trial court worked to alleviate the prejudicial effect of the [contextual background] evidence, and we also presume that juries follow the instructions given to them by the trial court."). It is the responsibility of the Defendant, however, to request the appropriate limiting instructions. See Little, 402 S.W.3d at 210.

### E. Mandatory Death Sentence Review

By statute, appellate review of a sentence of death has "priority over all other cases" and requires determinations as to whether:

(A) The sentence of death was imposed in any arbitrary fashion;

(B) The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;

(C) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and

(D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

Tenn. Code Ann. § 39-13-206(c)(1).

As indicated, the erroneous admission of the evidence relating to the Perez murder requires a new trial in this case. Accordingly, we will not evaluate the arbitrariness of the Defendant's death sentence, the sufficiency of the evidence supporting the aggravating circumstances, whether the aggravating circumstances outweighed the mitigating circumstances, or whether the Defendant's sentence of death was disproportionate to the

same penalty imposed in other cases.  Cf. Sexton, 368 S.W.3d at 428-29.[9]  Our ruling does not preclude the State from seeking the death penalty on remand.  See Smith v. State, 357 S.W.3d 322, 328 (Tenn. 2011).

### III. Conclusion

The trial court committed prejudicial error by admitting the evidence of the Perez murder.  The convictions are reversed, and the case is remanded to the trial court for additional proceedings consistent with this opinion.  Costs of this appeal are taxed to the State of Tennessee.

_____
GARY R. WADE, CHIEF JUSTICE

---

[9] Our reversal of the Defendant's convictions also pretermits all other issues raised on appeal but not addressed in this opinion.