IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 5, 2017

### STATE OF TENNESSEE v. DEANDREY PETERSON

**Appeal from the Criminal Court for Shelby County**
**No. 14-04003          Paula L. Skahan, Judge**

_____

**No. W2017-00307-CCA-R3-CD**

_____

The Defendant, Deandrey Peterson, appeals his convictions for aggravated rape, aggravated robbery, aggravated burglary, and possession of a firearm during the commission of a dangerous felony for which he received an effective thirty-year sentence. On appeal, the Defendant contends that the evidence is insufficient to support his convictions and that the trial court violated Tennessee Rule of Evidence 404(b) in allowing the State to present evidence of offenses committed against other victims. We conclude that the trial court committed reversible error in admitting evidence of other criminal offenses. Accordingly, we reverse the judgments of the trial court and remand the case for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed and Remanded**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ALAN E. GLENN and J. ROSS DYER, JJ., joined.

Robert Brooks (on appeal), Memphis, Tennessee, and Deandrey Peterson, pro se (at trial), for the appellant, Deandrey Peterson.

Herbert H. Slatery III, Attorney General and Reporter; Linda D. Kirklen, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Abby Wallace and Carrie Shelton, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

The evidence presented at trial established that on March 9, 2014, the Defendant entered the victim's[1] apartment armed with a firearm, demanded money from her, raped her, and forced her to use her debit card to withdraw $200 from an ATM. On that evening, Ms. Clark, the victim's roommate, left to visit her boyfriend, and the victim expected her boyfriend to visit her later that night. The victim decided to take a shower before her boyfriend arrived.

The victim testified that while in the shower, she heard Ms. Clark's dog barking and believed her boyfriend, who had a key, was entering the apartment. Ms. Clark's dog kept barking, but the victim continued with her shower because the dog barked often. The bathroom door opened, and the victim looked around the corner and saw a man, whom she later identified as the Defendant, pointing a gun at her.

The victim had not seen the Defendant before that night. She said the Defendant was wearing a black "hoodie" and dark clothing, including dark denim or black jeans. He had white socks on his hands. The bottom of the Defendant's face was covered with what appeared to be a T-shirt. The victim could see the Defendant's eyes, a small portion of his forehead, and the top of his nose. She described the Defendant's gun as a "nice sized gun" that was black with silver at the top.

The Defendant instructed the victim to be quiet and to remain in the bathroom. He exited the bathroom and closed the door. The victim remained standing in the shower for approximately five minutes. The Defendant looked inside the bathroom and then closed the door. He returned and instructed the victim to get out of the bathroom. The victim grabbed a towel and went into her bedroom. The Defendant demanded money and her jewelry. The victim told him that she did not have any cash, and she only had "[f]ake jewelry," which was on the bed. The victim observed that the Defendant had been through her wallet and that its contents were scattered on her bed.

The Defendant instructed the victim to sit on an air mattress that was against the wall in the corner of the bedroom. Because the victim was staring at the Defendant's face, he instructed her to stop looking at him and to face the wall. The Defendant rummaged through the victim's closet and left the room.

The victim testified that her boyfriend began calling her and that at one point, he was driving around outside of her apartment. The Defendant instructed the victim to answer her cellular phone and to tell her boyfriend to leave. The Defendant looked outside through a window and saw her boyfriend driving around. The Defendant told the victim that if her boyfriend did not leave, the Defendant would shoot both the victim and

---

[1] It is the policy of this court to protect the identity of victims of sex-related offenses.

her boyfriend. The victim said the Defendant was holding his gun while making the threats.

The victim and the Defendant entered Ms. Clark's bedroom where the Defendant instructed the victim to sit on the bed. He used Ms. Clark's blue bandanna to blindfold the victim and instructed her to lie down on the bed. The Defendant asked the victim whether she wanted him to perform oral sex on her, and the victim said, "[N]o." The victim testified that when the Defendant asked her about oral sex, he "softened up" and that he "wasn't as mean. Like he wasn't telling me he was going to shoot me if I didn't have sex with him." The Defendant asked the victim where the condoms were, and the victim was crying and did not respond. He told the victim that if she did not stop crying, he would shoot her in the head and leave. He asked her whether she wanted him to shoot her in the head and leave. The victim told him that she did not know where any condoms were.

While the victim was still blindfolded, the Defendant instructed her to lie down on the floor, and he produced a condom and vaginally raped her. Afterwards, the Defendant went into the bathroom, and the victim heard water running and the toilet flush. The victim opened her eyes under the blindfold and saw the Defendant rummaging through Ms. Clark's closet. The Defendant instructed the victim to go wash herself. After the victim washed herself in the bathroom, the Defendant told her to put on some clothes because they were going to walk to an ATM machine. The Defendant had taken the victim's cellular phone.

The Defendant and the victim walked outside the apartment and through a few buildings. The victim testified that the Defendant was either leading the way or directing their path. She did not know where the Defendant's gun was but said it was likely in his hand. The Defendant told the victim "not to do anything stupid because it will get ugly." He stopped at a building and instructed the victim to withdraw $200 from an ATM machine located across the street. The victim stated that the ATM machine was inside a glass building next to a gas station. She did not know where the Defendant was while she was at the ATM machine and said she attempted to look around but did not see anyone. The victim stated that she did not flee because she did not know where the Defendant was. The victim withdrew $200, walked back across the street, and gave the money to the Defendant. The Defendant instructed the victim to reach into his pocket and retrieve her cellular phone.

While the Defendant and the victim were walking back toward the victim's apartment, the Defendant asked her whether she wanted him to continue walking her home, and she said she did not. The Defendant asked whether she intended to call the police, and she assured him that she did not. He told her that he lived in the area and that

if he saw that she contacted the police, he would return and shoot everyone. The Defendant then walked away, and the victim returned to her apartment. The victim called her boyfriend, who had returned to his home in Horne Lake, Mississippi, and he told her to leave the apartment. The victim walked across the street to an Extended Stay motel where she called Ms. Clark. The victim explained that she did not contact the police because she was afraid.

After Ms. Clark and her boyfriend arrived, the victim got into their vehicle, and they drove around until they located a police officer. The victim reported the rape, and the officer contacted other officers to respond. The victim accompanied the officers back to her apartment where she walked through the apartment with the crime scene investigators. Officers then took her to the Rape Crisis Center to be examined.

The victim identified the Defendant as her attacker in a photographic line-up on April 14, 2014, and at trial. She testified that she recognized the Defendant by his eyes. She stated that during the episode, she stared at the Defendant until he told her to not to look at him or blindfolded her. She maintained that she was "100 percent sure" that the Defendant was the man who attacked her.

The victim was shown a photograph of a broken window at her apartment that was located on the same side as the door knob. She said the window was not broken prior to the Defendant's entry into the apartment. She believed the Defendant broke the window in order to unlock the door and open it.

On cross-examination, the victim testified that in her written statement to the police, she described the perpetrator as an African-American male who was twenty-two or twenty-three years old, was approximately 5 feet, 7 inches or 5 feet, 8 inches tall, and had an average build. The victim told officers that the perpetrator was wearing a black jacket with a hood that was over his head and closed over his mouth and the lower portion of his face. She said he was also wearing either dark or black denim pants, dark tennis shoes with white trim, and socks over his hands. She did not see any tattoos on the perpetrator.

The victim's boyfriend testified that he was supposed to visit the victim on the night of the offenses. He was living in Horn Lake, Mississippi, which was approximately thirty to forty minutes away from the victim's apartment. He said he did not have a key to the victim's apartment at that time. He called the victim several times while driving to her apartment, but she did not answer any of his calls. He arrived at the apartment complex and began walking toward the victim's apartment when the victim answered his call. The victim told him to go back home and continued to repeat the statement. Her boyfriend said that although he did not feel comfortable leaving, he complied with the

victim's request. He said that he noticed that one of the window panes by the victim's apartment door was broken and that he had not noticed the broken window previously.

The victim's boyfriend testified that he had not made it back home before the victim called him crying. She did not provide many details, but because he knew something bad had occurred, he turned his car around and drove back toward the victim's apartment. He found the victim in a patrol car a few blocks away from her apartment. She later told him that she had been assaulted.

Ms. Clark testified that she left the apartment she shared with the victim around 11:00 p.m. or midnight to visit her boyfriend. Approximately one and one-half hours later, Ms. Clark checked her cellular phone and noticed multiple missed calls from the victim. When Ms. Clark called the victim, Ms. Clark noticed that the victim's voice was "quivering" and that the victim sounded like she had been crying. The victim told Ms. Clark that someone had broken into the apartment but did not take anything. Ms. Clark and her boyfriend then began driving toward the apartment. When they neared the apartment, the victim told Ms. Clark that the person raped her and that she ran to an Extended Stay Hotel. Ms. Clark and her boyfriend met the victim at the hotel. The victim was crying and ran to their car.

Ms. Clark stated that the victim told her that she had not called the police because the man warned her that if she did so, he would return and kill both the victim and Ms. Clark. Ms. Clark said she and her boyfriend made the victim call the police anyway. After the victim was placed on hold, they decided to drive to the nearest precinct. While driving, they saw a police officer and flagged him down.

Ms. Clark said she was allowed to reenter the apartment after the victim walked through the apartment with the officers. Ms. Clark noticed that everything that was in her closet and on her shelves had been thrown on the floor and that her comforter was missing. She stated that the window by the door was not broken when she left to visit her boyfriend earlier that night. The following day, Ms. Clark and the victim gathered their belongings and left the apartment.

The victim's mother testified that the victim called her between 1:30 and 2:00 a.m. and reported that she had been raped. The victim's parents met the victim at an area near the apartment, where the victim was sitting in a patrol car. The victim's mother and others returned to the apartment and waited outside while the victim and the police officers entered the apartment. While standing outside, the victim's mother observed a person who appeared to be male walk down the street and stop to watch. She said that the man was wearing dark clothing with a hoodie and a jacket and that his head appeared to be covered. The victim's mother got the attention of the victim's father. The victim's

father began to approach the man, but the man ran away. The victim's mother and others ran to the sidewalk but that by the time they arrived, the man was gone.

Crime scene investigators took photographs and collected evidence during the walk-through of the apartment with the victim. Officer Chris Sanders said he did not dust for fingerprints because the perpetrator had been wearing socks as gloves. Officer Sanders noted that a window pane near the door was broken and that glass was inside the apartment. He stated that it appeared that someone standing outside "punched" in the window, causing the glass to fall inside the apartment.

Ms. Kristine Gable, the nurse coordinator at the Rape Crisis Center, was accepted by the trial court as an expert in the areas of sexual assault and forensic sexual assault examinations. She noted that Ms. Judy Penson, a nurse practitioner, examined the victim on March 10, 2014, at 7:00 a.m. A physical examination revealed no injuries. Ms. Gable explained that most victims of sexual assault do not show signs of injury due to the elasticity of the genital tissue to accommodate the biological process of reproduction which includes intercourse and child birth. A rape kit was also collected. The victim reported that the perpetrator used a condom and that she had urinated and bathed since the assault, which Ms. Gable stated could affect the presence of DNA for collection.

Ms. Gable read the victim's account of the assault as stated in the report of the victim's examination. According to the report, the victim stated that when she exited her shower, she was met by a man holding a gun and demanding money. The man rummaged through the victim's belongings throughout the home and threated to shoot the victim. The victim stated that the man instructed her to go into her roommate's bedroom where he began touching her legs. The man blindfolded the victim, told her to lie down, and found a condom in the bedroom. The victim stated that the man raped her through penile/vaginal intercourse on the bed and on the floor and that she believed he ejaculated. The man then made the victim wash herself. He demanded her debit card and PIN number and made her walk to the bank and withdraw $200. The victim stated that when she returned and gave the man the money, he told her that he would shoot her if she contacted the police.

Special Agent Donna Nelson, a forensic scientist with the Tennessee Bureau of Investigation, was accepted by the trial court as an expert in the area serology and forensic analysis. She received the rape kit and found no presence of semen on the swabs. She explained that the result were consistent with prophylactic use and washing afterwards.

Memphis Police Sergeant Chris Vaden testified that the Defendant was developed as a suspect in the case and that it was determined that the Defendant was living in an

apartment with the mother of his children. She consented to a search of the apartment. During the search, officers located a loaded gun in the nightstand in the master bedroom. At trial, the victim identified a photograph of the gun as the same gun that the Defendant used during the attack. The Defendant gave a statement to the police during which he acknowledged that the gun belonged to him and that he had been using it.

The victim in another case ("Victim 1") testified that on February 12, 2014, at approximately noon, she was alone in her apartment and walked into her kitchen where she saw a man pointing a gun at her. She stated that the man was wearing a plaid jacket, black jeans, a black cap, and a handkerchief over the bottom portion of his face and nose. Victim 1 could see the man's eyes. She identified the Defendant as the perpetrator in a photographic line-up on April 11, 2014, and at trial. She identified a photograph of the gun, which was the same firearm that officers recovered in the Defendant's apartment and the same firearm identified by the victim as the gun that the Defendant used on her during her attack.

Victim 1 did not know how the Defendant got into her apartment. She said he pointed the gun at her and told her not to scream. He walked her to her bedroom and sat her down on her bed. He used a dress that was on her bed to blindfold her and roamed around the apartment, searching for money. He returned to the bedroom and asked if he could perform oral sex on her, and Victim 1 said, "No." He asked her to masturbate him. He then vaginally raped her. Victim 1 said that the Defendant used a condom but that she did not know where he got the condom. She stated that when the Defendant spoke to her during the assault, his tone was "gentle" and that he was not "loud" or "harsh." She said, "It was like he was fantasizing like I was his girlfriend."

Victim 1 testified that the Defendant took money from her and roamed around the apartment as if he did not want to leave. The Defendant remained in her apartment for approximately one and one-half hours, and Victim 1 remained blindfolded during the entire episode. Before the Defendant left, he warned her to not call the police and said that if she did so, he would return to shoot and kill her. Victim 1 recalled that the Defendant told her that he was leaving and then walked toward the back door. He opened and shut the door, and Victim 1 believed that he had left. However, she heard him walking back through the apartment. He continued opening and shutting the door about five times before he finally left.

On cross-examination, Victim 1 testified that she told officers that the perpetrator was wearing a black baseball cap, a plaid jacket, black jeans, and a handkerchief over his face. She described the perpetrator as in his mid-20's, 5'5 to 5'7 tall, and 170 to 180 pounds with short hair. She acknowledged that she did not mention the perpetrator's skin

tone, eye color, or facial features. On redirect examination, she maintained that she had no doubt that the Defendant was the man who attacked her.

The victim in a second case ("Victim 2") testified that on March 27, 2014, at approximately 2:30 a.m., she awoke to the barking of a friend's dog that she had been keeping. She walked into the kitchen where she saw a man holding a gun. She described the man as dressed in dark clothing with his head, mouth, and nose covered. She could see his eyes. She identified the Defendant as the perpetrator in a photographic line-up and at trial. She identified a photograph of the gun, which was the same gun that officers recovered in the Defendant's apartment and the same gun identified by the victim and Victim 1 as the gun that the Defendant used during their attacks.

The Defendant demanded money and "kush." He led Victim 2 into her bedroom and instructed her and her daughter to get into bed and cover their eyes with the sheets. He roamed around the apartment searching for money and ultimately took an electronic tablet and money out of Victim 2's purse. He returned to the bedroom and instructed Victim 2 to go with him into the living room.

The Defendant had Victim 2 sit on the couch and used the pajama pants that she had been wearing to blindfold her. He asked if he could perform oral sex on her, and she said, "No." He performed oral sex on her anyway. The Defendant then put on a condom and raped her vaginally. Victim 2 stated that while the Defendant was assaulting her, he was acting "like he was romantic" and as if they were in a relationship. She said that while she was unsure of what the Defendant did with the condom following the attack, he went into the bathroom, and she heard the toilet flush.

Victim 2 testified that the Defendant remained in her apartment following the attack and was there for a total of two hours. Before leaving, the Defendant told her that he had an application on his cellular phone that would allow him to hear all radio transmissions from the police department. He said that if she called the police, he would know it and would return to kill her and her daughter. Victim 2 stated that a few hours after the attack, she recalled previously meeting a man at a gas station with the same distinct eyes and voice as her attacker.

On cross-examination, Victim 2 testified that sometime prior to the attack, she met the Defendant at a gas station and that they exchanged telephone numbers. After the Defendant called her approximately eighteen times later that day, she told him that she was married. She said the Defendant was the same person who attacked her in her apartment. She specifically recalled the Defendant's eyes and his voice.

On redirect examination, Victim 2 testified that she told police officers that the man who she met at the gas station and her attacker were both short and skinny with light skin. She said she never saw the man's hair because he was wearing a hat on the day that they met and during the attack. She told officers that she could identify her attacker by his eyes.

On recross-examination, Victim 2 testified that although her apartment was dark during the attack, there was an outside light shining into the apartment, which enabled her to see the Defendant's eyes. She said she was able to see the Defendant's eyes after the Defendant turned on the bathroom light to clean himself and had her clean herself. She stated that she told police officers that the man who attacked her was wearing a black baseball cap with a chenille scarf around his face. She also stated at trial that he also was wearing a large jacket and low sagging jeans. She acknowledged that during a preliminary hearing, she testified that she could not tell what her attacker was wearing because it was too dark. On redirect examination, she affirmed that the Defendant was her attacker and said she recognized his voice.

The Defendant chose not to testify or present any other evidence at trial. The jury convicted the Defendant of aggravated rape, aggravated robbery, aggravated burglary, and possession of a firearm during the commission of a dangerous felony. The trial court sentenced the Defendant to twenty years for aggravated rape, ten years for aggravated robbery, six years for aggravated burglary, and four years for the firearm conviction. The trial court ordered that the sentences for aggravated burglary and the firearm conviction run consecutively. The trial court also ordered that the sentences for aggravated rape and aggravated robbery run consecutively to each other but concurrently to the sentences for the other convictions for an effective sentence of thirty years. The Defendant appeals.

## ANALYSIS

### I. SUFFICIENCY

The Defendant asserts that the evidence presented at trial is insufficient to establish his identity as the perpetrator. The State argues in a footnote in its brief that the Defendant has waived this issue and states that "Defendant also lists a sufficiency of the evidence challenge in his Statement of the Issues but argues it nowhere in his brief." However, a cursory review of the Defendant's brief reveals that the Defendant clearly raised and argued the issue of sufficiency of the evidence on pages eight and nine of his ten-page brief. Accordingly, the State's statement in its brief is woefully incorrect. Despite the State's failure to address the issue, we conclude that the evidence sufficiently established the Defendant's identity as the perpetrator.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

As it relates to this case, aggravated rape is the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim" where "[f]orce or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon." T.C.A. § 39-13-502(a)(1). Aggravated robbery is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear" and is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. §§ 39-13-401; -402(a)(1). Aggravated burglary, as charged here, is the entering of a habitation without the owner's consent and with the intent to commit rape. T.C.A. §§ 39-14-402(a)(1); -403(a). Finally, "[i]t is an offense to possess a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony," which in this case was aggravated burglary. T.C.A. § 39-17-1324(a), (i)(H).

The identity of the perpetrator "is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Identity "may be established solely on the basis of circumstantial evidence." *State v. Lewter*, 313 S.W.3d 745, 748 (Tenn. 2010).

"The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." *State v. Radley*, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) (citing *State v. Strickland*, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993)). The issue of identity is a question of fact left to the jury as the trier of fact to resolve. *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982).

In the present case, the victim identified the Defendant as the perpetrator in both a photographic line-up following the offenses and at trial. Although a portion of the Defendant's face was covered during the attack, the victim could see his eyes, and she stared at him during the long criminal episode until he either told her to not look at him or blindfolded her. She said that she recognized the Defendant as the perpetrator by his eyes and that she was "100 percent sure" that the Defendant was her attacker. The victim also identified a photograph of the gun that the Defendant possessed during the attack. Police officers discovered the gun in the Defendant's apartment, and the Defendant admitted that the gun belonged to him and that he used it. While the Defendant challenges the credibility of the victim, we reiterate that it was the jury's prerogative, as the trier of fact, to evaluate the credibility of the witnesses, determine the weight given to the witnesses' testimony, and reconcile all conflicts in the evidence. *See Bland*, 958 S.W.2d at 659. We conclude that this evidence, when viewed in a light most favorable to the State, is sufficient to establish the Defendant's identity as the perpetrator.

## II. 404(b) EVIDENCE

The Defendant contends that the trial court committed reversible error in admitting evidence of two other rapes and robberies in violation of Tennessee Rule of Evidence 404(b). The State responds that the trial court did not abuse its discretion in admitting the evidence. We agree with the Defendant.

### A. Evidentiary Proceedings

Prior to trial, the State filed a notice of its intent pursuant to Rule 404(b) to use evidence of three other rapes, including those of Victim 1 and Victim 2, which were committed by the Defendant between February and March 2014. The State alleged that the evidence of the other rapes was relevant to the issues of intent, identity, lack of mistake, lack of consent, and common scheme or plan. The State contended that the similarities between the execution of the crimes established "the intent for a unique and signature scheme to rape and/or rob these victims" and had significant probative value as to the Defendant's identity. The Defendant filed a pro se response admitting that identity was an issue at trial but maintaining that the circumstances of the offenses were not so distinctive as to constitute signature crimes. During the third day of trial, the State filed

an amended notice stating that it intended to present evidence of the rapes of Victims 1 and 2 committed by the Defendant. The State maintained that the Defendant's acts constituted signature crimes and were relevant to the issues of intent, motive, and common scheme or plan. The State also sought to present the evidence for the purpose of "providing contextual background evidence for the jury."

Following the testimony of the victim, various lay witnesses, and law enforcement officials at trial, the State renewed its request to present the testimony of Victims 1 and 2 regarding the rapes and robberies that the Defendant committed against them. The State argued that the Defendant's actions constituted signature crimes.

During a jury-out hearing, Victims 1 and 2 offered substantially the same testimony about their attacks as they had offered at trial. At the conclusion of their testimonies, the State addressed the circumstances which it argued that were similar in the cases of the victim, Victim 1, and Victim 2:

> [The victim] testified to the jury that he broke into her apartment. She was in the shower. She saw the gun. Identified this as the weapon that was held in her face.
>
> He … had his head covered. His face was covered. He rummaged through her apartment. He blindfolded her. He requested to perform oral sex on her and then raped her vaginally. He threatened her life with the gun. Threatened her to keep from going to the police. He spent time in her apartment and according to her, the way he was acting was smoother, softer, than when he had first entered into the apartment.

The trial court found that identity was a material issue in the case. The trial court considered the circumstances referenced by the State, as well as the use and disposal of a condom in the victims' apartments in each case, to be "distinctive behavior." The trial court also noted that the attacks of Victims 1 and 2 occurred during a time period in close proximity to the victim's attack. The trial court found the evidence of the offenses against Victims 1 and 2 were established by clear and convincing evidence. The trial court also found that the probative value of the evidence as it related to the issue of identity was not outweighed by the danger of unfair prejudice. Accordingly, the trial court allowed the State to present the testimony of Victims 1 and 2 in its case-in-chief.

## B. Analysis

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid.

404(b).  Rule 404(b) has been described as a rule of exclusion rather than inclusion.  *State v. Jones*, 450 S.W.3d 866, 891 (Tenn. 2014).  "Trial courts have been encouraged to take 'a restrictive approach of [Rule] 404(b) . . . because "other act" evidence carries a significant potential for unfairly influencing a jury.'"  *Id.* (quoting *State v. Dotson*, 254 S.W.3d 378, 387 (Tenn. 2008)).

Evidence of other acts may be admissible for other non-propensity purposes, such as "to establish motive, intent, identity, absence of mistake, or common plan or scheme," or "contextual background."  *State v. Little*, 402 S.W.3d 202, 210 (Tenn. 2013); *see* Tenn. R. Evid. 404(b), Advisory Comm'n Cmts.  Evidence may be admitted for these purposes if the following requirements have been met:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

If the trial court has substantially complied with the procedure mandated by Rule 404(b), a trial court's decision to admit or exclude evidence pursuant to Rule 404(b) is reviewed under an abuse of discretion standard.  *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997).  A trial court abuses its discretion when "'it applies an incorrect legal standard or its decision is illogical or unreasonable, is based on a clearly erroneous assessment of the evidence, or utilizes reasoning that results in injustice to the complaining party.'"  *Jones*, 450 S.W.3d at 892 (quoting *State v. Adams*, 405 S.W.3d 641, 660 (Tenn. 2013)).  If the trial court has failed to substantially comply with the procedural mandates of Rule 404(b), our standard of review is de novo.  *State v. Mallard*, 40 S.W.3d 473, 486 n.13 (Tenn. 2001) (citing *DuBose*, 953 S.W.2d at 652-53).

The trial court held an evidentiary hearing outside the jury's presence and found that a material issue regarding identity had been raised, that the Defendant's commission of the other rapes and robberies had been established by clear and convincing evidence, and that the probative value of the evidence was not outweighed by the danger of unfair

prejudice. By doing so, the trial court substantially complied with the procedural mandates of Rule 404(b). Therefore, our standard of review is abuse of discretion.

The Defendant conceded in the trial court that identity was a material issue at trial. On appeal, he does not challenge the trial court's finding that the State established his commission of the other rapes by clear and convincing evidence. Rather, he challenges the trial court's finding that the offenses for which he was on trial and the two other rapes and robberies constitute distinctive or signature crimes.

The issue of signature crimes relates to the determination of whether the probative value of other act evidence is outweighed by the danger of unfair prejudice. *See Jones*, 450 S.W.3d at 894-95; *see also* Tenn. R. Evid. 404(b)(4). Unlike Tennessee Rule of Evidence 403, which allows the admission of relevant evidence if the danger of unfair prejudice does not "substantially outweigh[]" the probative value of the evidence, Rule 404(b)(4) requires that the other crime evidence be excluded if the danger of unfair prejudice "outweigh[s]" the probative value. Rule 404(b)'s restrictive approach "recognizes that evidence of other crimes, wrongs[,] or acts carries a significant danger of unfair prejudice." *DuBose*, 953 S.W.2d at 654. "When the other crime is similar to the charged offense in the pending case, the danger of unfair prejudice is especially prevalent, increasing the likelihood that '[the] jury would convict on the perception of a past pattern of conduct, instead of on the facts of the charged offense.'" *Jones*, 450 S.W.3d at 894 (quoting *Mallard*, 40 S.W.3d at 488).

When the material issue at trial is the identity of the defendant as the perpetrator, the probative value of the evidence of the other crime depends upon the extent to which the proof raises an inference that the perpetrator of the charged offense and the perpetrator of the other crimes are one and the same. *Id.* at 895. Both the existence and the strength of the inference require an evaluation of the similarities between the charged offense and the other crimes. *Id.* Accordingly,

> "if the characteristics of both the prior offense and the charged offense are not in any way distinctive, but are similar to numerous other crimes committed by person other than the defendant, no inference of identity can arise. An inference of identity from prior crimes can only arise when the elements of the prior offense and the charged offense, singly or together, are sufficiently distinctive to warrant an inference that the person who committed the prior offense[] also committed the offense on trial."

*Bunch v. State*, 605 S.W.2d 227, 230 (Tenn. 1980) (quoting *United States v. Powell*, 587 F.2d 443, 448 (9th Cir. 1978)).

"Before multiple offenses may be said to reveal a distinctive design, and therefore give rise to an inference of identity, the 'modus operandi employed must be so unique and distinctive as to be like a signature.'" *State v. Moore*, 6 S.W.3d 235, 240 (Tenn. 1999) (quoting *State v. Carter*, 714 S.W.2d 241, 245 (Tenn. 1986)).  While the evidence of the other charged offense and the evidence of the other crimes need not be identical, *Jones*, 450 S.W.3d at 895, "a proper analysis of this issue must be accompanied by more than a mere weighing of the similarities and differences of the various offenses." *Moore*, 6 S.W.3d at 241.  Rather, the methods used in the commission of the offenses must have "'such unusual particularities that reasonable men can conclude that it would not likely be employed by different persons.'" *Id.* at 240 (quoting *Harris v. State*, 227 S.W.2d 8, 11 (Tenn. 1950).  To be admissible, "'the *modus operandi* of the other crimes and the crime on trial must be substantially identical *and must be so unique* that proof that the defendant committed the other offense fairly tends to establish that he also committed the offense with which he is charged.'" *Id.* (quoting *Bunch*, 605 S.W.2d at 230) (emphasis in original).

The trial court found that the Defendant engaged in "distinctive behavior" based on his breaking into the apartments of each victim, covering his face and head, threatening each victim with a gun, blindfolding each victim, requesting to perform oral sex on each victim, raping each victim vaginally while using a condom, speaking to each victim in a "smoother, softer" voice, disposing the condoms while in the apartments, spending time inside each apartment, and threatening each victim if they contacted the police.  The trial court's findings, however, ignore numerous and substantial differences between the modus operandi of the offenses for which the Defendant was on trial and the modus operandi of the two other rapes and robberies.

While the Defendant asked to perform oral sex on each victim, he performed oral sex only on Victim 2, and he asked Victim 1 to masturbate him.  While raping Victims 1 and 2, the Defendant spoke to them as if he was in a romantic relationship with them.  The Defendant initially "softened" when asking the victim whether she wanted him to perform oral sex on her, but he then threatened to shoot her in head and leave when the victim continued to cry and before raping her.  The Defendant completed the robberies of Victims 1 and 2 by taking money from them while still in their apartments.  He remained in the apartments of Victims 1 and 2 for a period of time before leaving.  Victim 1 remained blindfolded during the episode.  The Defendant completed the robbery of the victim by requiring her to put on her clothes after the rape and forcing her to leave her apartment, walk a distance to an ATM, and withdraw $200.  After walking with the victim back toward her apartment, the Defendant walked away from her and allowed her to return to her apartment alone.  The Defendant wore socks as gloves during the offenses involving the victim.  The offenses involving the victim and Victim 2 occurred during the late night and early morning hours, while the offenses involving Victim 1 occurred

around noon. There was nothing in the record regarding the proximate location of the three victims' apartments to each other or to the Defendant's apartment.

A review of these significant differences leads us to conclude that the modus operandi of the offenses for which the Defendant was on trial was not "substantially identical" to the modus operandi of the two other rapes and robberies. *See Moore*, 6 S.W.3d at 240. The trial court neglected to mention these significant differences or accord appropriate weight to them. *See Jones*, 450 S.W.3d at 896-97 (concluding that the trial court abused its discretion in admitting evidence of a subsequent murder in the defendant's murder trial based, in part, on the trial court's failure to properly weigh the significant differences between the murders).

The State relies upon *State v. Wooden* to support its claim that the offenses for which the Defendant was on trial and the two other rapes and robberies were so distinctive as to constitute signature crimes. 658 S.W.2d 553, 557-58 (Tenn. Crim. App. 1983), *abrogated on other grounds by State v. Dyle*, 899 S.W.2d 607, 612 (Tenn. 1995). In *Wooden*, this court concluded that the signature crime standard was satisfied regarding two sex offenses with the following similarities:

> Each of the victims was a young, white female who lived in an apartment complex and was alone at the time of the offense. In each case the attacker would be in the apartment when the victim arrived or would enter shortly after the victim entered the apartment. The attacker would cover the head of the victim or force her to turn her back so she could not see him. The attacker would force the victim to submit to cunnilingus and then force her to submit to vaginal intercourse. He would then demand that the victim rub his nipples as he performed vaginal intercourse. The offenses occurred from June of 1980 until January 1982. Each of the crimes occurred in apartment complexes which were in close geographic proximity.

*Id.*

Unlike *Wooden*, however, there are substantial differences in the modus operandi of the offenses for which the Defendant was on trial and the modus operandi of the two other rapes and robberies. In numerous cases, Tennessee courts have focused on the significant differences in the methods employed in holding that separate offenses did not rise to the level of signature crimes. *See, e.g., Jones*, 450 S.W.3d at 896-97 (discussing the significant differences between the charged murders and the subsequent murder, including the fact that the charged murders involved two elderly victims in a suburban home and was perpetrated by the defendant and an accomplice, the subsequent murder involved a young male victim and an unidentified female in a motel located in a high

- 16 -

crime area and included evidence of sexual assault, and not all the victims were found in the same position or had evidence of being bound); *State v. Shirley*, 6 S.W.3d 243, 249 (Tenn. 1999) (holding that the similarities in four robberies were not so unique as to constitute signature crimes and that the differences demonstrated that the offenses did not share a distinct or unique modus operandi, including the fact that the robber's clothing in two robberies differed from his clothing in the other two robberies, that various witnesses disagreed as to the type of gloves used by the robber in three robberies, that the method of escape differed in the robberies, and the robber removed his ski mask before completing two of the robberies); *Moore*, 6 S.W.3d at 241 (holding that offenses of child rape of the same victim occurring two months apart did not have a modus operandi that was so unique and distinctive as to be like a signature when the methods employed by the defendant in each rape differ substantially and that the events of the later offense "are so extraordinary and utterly disgusting that no pattern can be discerned that would logically or reasonably coincide with the earlier … offense"); *Harris*, 227 S.W.2d at 11 (holding that the methods employed in two rapes committed one week apart were not so peculiar as to justify admission of the other crime evidence when the multiple similarities included their temporal proximity, the commission of both rapes by forcible coercion, and the use of a knife in both cases but the significant differences included the nature of the sexual acts committed and the location of the offenses).

While there are similarities between the offenses for which the Defendant was on trial and the other two rapes and robberies, those similarities fail to establish that the modus operandi employed is so unique as to constitute a signature crime. *See State v. Roberson*, 846 S.W.2d 278, 280 (Tenn. Crim. App. 1992) ("[M]ere similarity in the manner in which two crimes are committed does not produce the relevance necessary for admission—uniqueness does."). The State argues that "some of the shared aspects of the crimes were particularly unique and strange, such as the way the assailant appeared to fantasize that he was romantically involved with the victims during the sexual assault and the facts that he had the same distinctive eyes that all three victims identified as Defendant's." However, while there was testimony that the Defendant appeared to be fantasizing that he was romantically involved with Victims 1 and 2 while raping them, the victim of the offenses for which the Defendant was on trial testified that the Defendant "softened" and was not "as mean" while asking her if she wanted him to perform oral sex and that he then threatened to shoot her because she continued to cry. Moreover, while the State argues that each victim's ability to identify the Defendant as the perpetrator based on the physical appearance of his eyes constitutes a "unique" circumstance that supports a finding of a distinctive or signature crime, "the trial court must look for a distinctive *method* used to commit the crimes and not simply for evidence tending to show that the defendant was the offender. By its very definition, a modus operandi is not revealed merely by evidence showing that the defendant committed the crimes sought to be joined." *Shirley*, 6 S.W.3d at 250 (emphasis in original); *see also*

*Young v. State*, 566 S.W.2d 895, 898 (Tenn. Crim. App. 1978) (stating that the "test is not whether there was evidence that a defendant committed both crimes, but whether there was a unique method used in committing the crimes").

The trial court's finding that the offenses constituted signature crimes was "based on a clearly erroneous assessment of the evidence." *See Jones*, 450 S.W.3d at 898. Because the State failed to establish the two other rapes and robberies as signature crimes that could be used to prove the Defendant's identity in the offenses against the victim, the admission of the evidence of the two other rapes and robberies was extremely prejudicial. By allowing evidence of these other offenses, the jury had the opportunity to infer that the Defendant committed the other offenses and, therefore, must have committed the offenses for which he was on trial. *See id.* at 899; *Dotson*, 254 S.W.3d at 387 ("When the defendant's prior bad acts are similar to the crime for which the defendant is on trial, the risk of unfair prejudice is even higher."). We recognize that the trial court gave a limiting instruction to the jury both before and after the evidence of the other offenses was presented and that the State was careful in its closing argument to remind the jury that the evidence of the other offenses could only be considered for the issue of identity. However, a substantial amount of detail was presented regarding the other rapes and robberies. Due to the absence of a sufficiently distinctive modus operandi amounting to a signature crime, the danger of unfair prejudice created by the evidence of the other offenses clearly outweighed any probative value. *See Jones*, 450 S.W.3d at 899-900. We, therefore, conclude that the trial court abused its discretion in admitting the evidence of the other offenses.

Moreover, we are unable to conclude that the erroneous admission of the evidence was harmless. "A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. 36(b); *see Jones*, 450 S.W.3d at 900 (applying the harmless analysis standard to the erroneous admission of evidence under Rule 404(b)). The harmless error analysis "does not turn upon the existence of sufficient evidence to affirm a conviction or even a belief that the jury's verdict is correct. To the contrary, the crucial consideration is what impact the error may reasonably be taken to have had on the jury's decision-making." *State v. Rodriguez*, 254 S.W.3d 361, 372 (Tenn. 2008) (citations omitted).

The evidence connecting the Defendant to the offenses against the victim primarily consisted of the victim's testimony. Most of the perpetrator's face was covered during the offenses, and the victim was able to identify the Defendant based on his eyes. The Defendant's gun matched the gun used by the perpetrator during the offenses. No other witnesses testified as to the Defendant's presence at the scene, and no forensic

evidence tied him to the offenses. Although the evidence was sufficient to support the convictions, it was not so overwhelming as to preclude the granting of a new trial. Furthermore, the improperly admitted evidence was extremely prejudicial in that it was detailed and involved the same offenses for which the Defendant was on trial. As a result, we must hold that the erroneous admission of the evidence more probably than not affected the outcome of the trial. Therefore, we reverse the convictions and remand for a new trial.

## CONCLUSION

Based on the foregoing, we reverse the judgments of the trial court and remand the case for a new trial.

_____
JOHN EVERETT WILLIAMS, JUDGE